## PHILLIPS PETROLEUM CO. v. SHELL OIL CO., Inc.
### No. 11815.

Circuit Court of Appeals, Fifth Circuit.
March 1, 1948.
Rehearing Denied April 14, 1948.

Louis D. Fletcher, of New York City, J. Arthur Young, of Bartlesville, Okl., and J. Vincent Martin, of Houston, Tex., for appellant.

Theodore S. Kenyon, of New York City, Benjamin B. Schneider, of Chicago, Ill., and Brady Cole and Garrett R. Tucker, Jr., both of Houston, Tex., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

On Christmas Eve of 1941, Phillips Petroleum Company sued Shell Oil Company for infringement of claim 2 of Patent No. 2,002,394 issued in May, 1935, to plaintiff as assignee of the inventor Frey, seeking injunction and an accounting of profits and damages. The defendant denied infringement, and claimed the patent was void for lack of invention in view of the prior art,

and for other reasons. A counterclaim was made for a declaratory judgment that the patent is void, and that the operations of defendant are no infringement and may be continued without interference. The district court held claim 2 of the patent invalid because too vague and a mere invitation to experiment, and because lacking in invention in view of the prior art; and that defendant's operations did not infringe if the claim were valid; and judgment was given as prayed by defendant. Plaintiff appeals.

The patent application is headed, "Process for converting Hydrocarbons," and the first sentence is, "This invention relates to a process for converting hydrocarbons by thermal treatment into products of higher molecular weight, and more specifically, to reacting together paraffins and olefins into products of higher molecular weight which are substantially aliphatic in character." We are instructed by the evidence that the hydrocarbons are a numerous group of substances composed wholly of carbon and hydrogen and the molecular weight of each is principally due to the carbon atoms. Where the proportion of carbon in the molecule is quite small the substance will be a gas at ordinary temperatures and at atmospheric pressure; where it is greater, the compound is a light liquid; when increased yet more, heavier liquids and oils result; and at the top of the carbon scale solids occur. Natural gas and crude oil are a mixture of hydrocarbons, some more useful than others. Because of the demand for gasoline, and for certain other liquid hydrocarbons in making synthetic rubber and nylon, there has been great effort to convert the less useful of these hydrocarbons into others in great demand. It has long been known that some hydrocarbons are difficult to change into others by chemical action, they being stable in their nature, and "saturated" as to their chemical affinity for others, and hence called "paraffins", meaning "too little affinity." Others are unstable, inclined to deteriorate, and to react with one another, and are called "olefins." These terms are used throughout the patent. There is a third group, by some classed as paraffins, but more usually called "aromatics," which are once referred to in the patent. "Of higher molecular weight" refers particularly to the change of comparatively valueless gases into the desired liquids, which as above stated results when molecules are formed which have more carbon than those of the gases.

The first efforts, more than twenty-five years ago, to increase the volatile liquids obtainable from crude oil were directed to "cracking" by heat the molecules of the heavier liquids, and so reducing their carbon content. This process was called "fractionation," and the liquids produced "fractions." The effort here involved is the reverse, that is, to build up the molecular carbon content so as to turn gases or undesired light liquids into those desired. The oil industry was alert to this effort in the early 1930's. In 1932 the defendant, through the research department of Universal Oil Products Company, in which Ipatieff and Grosse were employed, was working at the problem, not by using heat and pressure, which are well known to favor chemical reactions, but by the use of catalysts, which in a less understood and less predictable way may promote such reactions. Ipatieff and Grosse's work culminated in patents, two of which were for catalysts, the applications being filed on July 5 and Oct. 22, 1932, before that of Frey, which was filed June 22, 1934. Frey, in the research department of plaintiff, was working on a process by "thermal treatment," as the above quotation and the whole tenor of his patent disclosure show, under high pressure. The use of a catalyst is only once mentioned by him, where it is said: "The reaction will proceed without the use of catalysts, but in some cases they are beneficial." No particular catalyst is suggested and no case is defined in which a catalyst had been found beneficial. Frey explicitly states what is the process which he wishes to patent: "The process consists in subjecting a paraffin hydrocarbon such as butane or propane to a temperature at which decomposition will take place but very slowly (400-500°C.) and under a pressure of 1,000 pounds per square inch or more, adding thereto a small portion of gaseous olefins, not exceeding ten percent of the paraffin, allowing the olefins to react and add-

ing from time to time additional small increments of olefin, maintaining a concentration of olefin in the reaction mixture not exceeding ten percent." In the examples which follow, a pressure of 3,000 pounds is specified and a heat of 470°C. equivalent to say 900° Fahrenheit. Of the seven claims of the patent, all save Claim 2 specify as a part of the process a pressure exceeding 1,000 pounds and temperature of 400° to 500°C. or a "decomposition temperature," or a "reaction temperature," or merely "heating"; and they include maintaining in the mixture not more than 10% by weight of olefins. Claim 2, which alone is involved here, reads: "2. In a process for the production of higher boiling hydrocarbons from lower boiling hydrocarbons, the step which consists in adding to a stream of predominantly saturated hydrocarbons, maintained at a conversion temperature and pressure, successive small quantities of predominantly olefinic hydrocarbons in such amount that the content of added olefin in the mixture at no time exceeds 10% by weight of the total hydrocarbons present."

Now the defendant in its plants is not converting hydrocarbons by "thermal treatment", but instead of heating its mixtures it keeps them chilled below ordinary temperatures and far below "decomposition temperature," or "conversion temperature" from a heat standpoint alone; and conversion is brought about by the use of a catalyst, strong sulphuric acid, perhaps the first used and best known catalyst, but yet found not to be effective with all hydrocarbons. Defendant is thus not using the catalysts which it patented through Ipatieff and Grosse. As to pressure, defendant uses only approximate atmospheric pressure. It does add successively small quantities of an olefin so that the olefins present in the mixture do not exceed 10%, and indeed are less than 1%. Plaintiff, conceding that six of its claims are not infringed, urges that Claim 2 is, because its words "maintained at a conversion temperature and pressure" are broad enough to cover any temperature and pressure at which a conversion occurs, although the conversion be induced by a catalyst.

We do not think this a proper scope to be given this claim. The claim must be interpreted in the light of the patent disclosure. The words "In a process for the production of higher boiling hydrocarbons" do not mean any process whatever, but such a process as is set forth in the disclosure. That process is by "thermal" treatment, with high temperatures and pressures as specified. No process by catalysis is disclosed, no catalyst is suggested, none was used by the inventor. The testimony is that in the hydrocarbon field a large number are known, including acids, metals, oxides and clays; and that the action of any one on any hydrocarbon cannot be predicted but must be tested empirically. This puts catalytic processes in a special class, and the patent discloses no catalytic process. Indeed we learn from the testimony of Frey that the three experiments on which he based his claim of discovery not only did not include a catalyst, but in constructing his apparatus he sought to avoid using anything that might have a catalytic effect; and that he never did any work with a catalyst prior to filing his patent application in 1934 nor until Jan. 20, 1936, months after the patent was granted. Now it turns out that the very successful catalytic method pursued by defendant works, not with olefins less than 10% as disclosed by the patent, but with a fraction of one percent. Economy in olefins is an important thing, not only to secure conversion of more paraffins, but also because it is known that with an excess of olefins present they will combine with one another and produce an unstable and undesirable element in gasoline. This remarkable economy achieved by a catalytic process cannot rightly be monopolized by a patentee who had never reduced to practice any such process, nor even specially contemplated it.

But if the claim can so be extended, it becomes invalid for want of sufficient disclosure of any catalytic process, so that one who sought to follow the patent must experiment in a wide field to find suitable catalysts and determine their effects. Even on the point of adding small quantities of olefins, less than 10% of the mixture, there is a fatal vagueness. Defendant's economy of less than one percent is not suggested. The patentee had not investigated the field of catalytic action.

387

The prior art also gives trouble, for it is clear that the aromatics, which some chemists class a paraffins, and which the patent mentions as within its scope, had for some years before the application been successfully converted into true paraffins by small quantities of olefins. Prior patents and publications spoke of adding the olefin "drop by drop" if a liquid, and as "bubbled in" when a gas, implying small quantities, and the reasons for limiting the quantity were understood. The conversion of aromatics, though not an anticipation, is certainly an allied art, which deprives of the dignity of invention the use of less than 10% of olefin elements which Frey claimed as his discovery.

So if Claim 2 be confined to the heat-pressure process which alone was disclosed, we think there is no infringement by defendant's operations which do not involve heat and pressure. If it be given the broad scope asserted for it, it is invalid for the reasons stated. Zenitherm Co. v. Art Marble Co., 5 Cir., 56 F.2d 39; Price-Trawick, Inc., v. Gas Lift Corp., 5 Cir., 101 F.2d 134; Halliburton Oil Well Cementing Co. v. Schlumberger Well Surveying Corp., 5 Cir., 130 F.2d 589. In either view the judgment is correct and must be affirmed.