## PHILLIPS PETROLEUM CO. v. ESSO STANDARD OIL CO.

### Civ. 3065.

United States District Court
D. Maryland.

April 12, 1950.

See also 91 F.Supp. 215.

Thomas W. Y. Clark, of Baltimore, Md., J. Bernhard Thiess, Thorley von Holst, Sidney Neuman, and Robert W. Poore, all of Chicago, Ill., and T. B. Hudson, J. A. Young, and J. O. Turner, all of Bartlesville, Okl., for plaintiff.

William L. Marbury, of Baltimore, Md., Theodore S. Kenyon and Malvin R. Mandelbaum, of New York City, Benjamin B. Schneider, of Chicago, Ill., and James K. Small, of Elizabeth, N. J., for defendant.

WILLIAM C. COLEMAN, Chief Judge.

This is a patent suit in which the plaintiff, Phillips Petroleum Company, a Delaware corporation, claims that the defendant, Esso Standard Oil Company, also a Delaware corporation, which maintains and operates an oil refinery in Baltimore, has infringed patent No. 2,002,394, issued May 21, 1935 to the plaintiff as assignee of the inventor, F. E. Frey, this patent being for a process for converting hydrocarbons. The defendant denies infringement and also asserts that the patent is invalid because anticipated by the prior art.

The alleged invention of the patent lies in that part of the field of petroleum chemistry which deals, broadly speaking, with

the conversion of gaseous hydrocarbons into liquid hydrocarbons, which are substances composed entirely of hydrogen and carbon. Such liquid hydrocarbons have properties which are essential in motor fuels. The conversion process is generally known in the industry as paraffin alkylation. With the last War, a great need arose for gasoline of the highest quality for use in airplane motors, particularly what is known as 100 octane gasoline, for the production of which the process under the patent and the alleged infringing process of the defendant have particular application.

More specifically, as stated in the first paragraph of the patent "This invention relates to the process for converting hydrocarbons by thermal treatment into products of higher molecular weight and, more specifically, to reacting together paraffins and olefins into products of higher molecular weight which are substantially aliphatic (open chain structure) in character and contain a high proportion of paraffins."

Hydrocarbons, of which there are many types, are, as just stated, substances composed wholly of carbon and hydrogen. Where the proportion of carbon in the molecule is very small, the substance is a gas at ordinary temperatures and at atmospheric pressure; where it is greater, the result is a light liquid and when increased, heavier liquids and oils result, and at the top of the carbon scale solids occur. Some hydrocarbons are stable in their nature and are referred to as being "saturated" as to their chemical affinity to other hydrocarbons and are called paraffins from "parum" meaning "too little", and "affinis" meaning "akin", so named in allusion to their chemical inactivity. Other hydrocarbons are unstable and are inclined to deteriorate and to react with one another and hence are called olefins which are hydrocarbons of the ethylene series, having but one double bond.

While the Frey patent issued with seven claims, only claim 2 is here in suit. It is as follows: "In a process for the production of higher boiling hydrocarbons from lower boiling hydrocarbons, the step which consists in adding to a stream of predominantly saturated hydrocarbons, maintained at a conversion temperature and pressure, successive small quantities of predominantly olefinic hydrocarbons, in such amount that the content of added olefins in the mixture at no time exceed 10% by weight of the total hydrocarbons present."

This same claim was quite recently litigated in the Fifth Circuit in a suit brought by the same plaintiff as the one in the present suit against Shell Oil Company. The District Court found claim 2 invalid and not infringed. The Court of Appeals affirmed, holding that if confined to the heat pressure process which alone was disclosed by the patent, there was no infringement and if given broader scope, the patent was invalid for want of sufficient disclosure of any catalytic process and because anticipated by the prior art. See Phillips Petroleum Company v. Shell Oil Company, 166 F.2d 384.

In the course of the trial of the present case a great deal of the same or substantially the same testimony was introduced that was heard in the Fifth Circuit case. In the course of its opinion in that case, the Fifth Circuit Court of Appeals said as follows, in finding that there was no infringement (166 F.2d at page 386):

"No process by catalysis is disclosed, no catalyst is suggested, none was used by the inventor. The testimony is that in the hydrocarbon field a large number are known, including acids, metals, oxides and clays; and that the action of any one on any hydrocarbon cannot be predicted but must be tested empirically. This puts catalytic processes in a special class, and the patent discloses no catalytic process. Indeed we learn from the testimony of Frey that the three experiments on which he based his claim of discovery not only did not include a catalyst, but in constructing his apparatus he sought to avoid using anything that might have a catalytic effect; and that he never did any work with a catalyst prior to filing his patent application in 1934 nor until Jan. 20, 1936, months after the patent was granted. Now it turns out that the very successful catalytic method pursued by defendant works, not with olefins less than 10% as disclosed by the

patent, but with a fraction of one percent. Economy in olefins is an important thing, not only to secure conversion of more paraffins, but also because it is known that with an excess of olefins present they will combine with one another and produce an unstable and undesirable element in gasoline. This remarkable economy achieved by a catalytic process cannot rightly be monopolized by a patentee who had never reduced to practice any such process, nor even specially contemplated it.

"But if the claim can so be extended, it becomes invalid for want of sufficient disclosure of any catalytic process, so that one who sought to follow the patent must experiment in a wide field to find suitable catalysts and determine their effects. Even on the point of adding small quantities of olefins, less than 10% of the mixture, there is a fatal vagueness. Defendant's economy of less than one percent is not suggested. The patentee had not investigated the field of catalytic action."

■ We likewise find that defendant's process does not infringe the Frey patent for the reason that defendant's catalytic process is distinctly different from the thermal process of the Frey patent, and there is no ground for treating it as the latter's equivalent. This conclusion is supported by the following facts which are established by the testimony: Application for the Frey patent was made in 1934, and the patent issued in 1935, up to which time Frey had never tried any catalyst in connection with his process. The single parenthetical reference to the use of catalysts in the patent was, as defendant's counsel asserts, presumably placed in the specification as sort of a catch-all statement. It merely recites that "The reaction will proceed without the use of catalysts but in some cases they are beneficial."

Frey first used a catalyst in 1936, after he had read certain patents to one Ipatieff and it proved a failure. In that same year he made application for another Patent No. 2,233,363, alleging that it constituted invention to use a known catalyst of the group consisting of zinc chloride and bromide, which is exactly the opposite position of plaintiff's main contention in the present case. So, even at this time, the use of sulfuric acid as a catalyst had not apparently occurred to Frey.

Next we find that in 1937 Frey applied unsuccessfully for a reissue of his patent in suit so as to cover the alkylation of aromatics and napthenes. Thus Frey asserted, in effect, that his high pressure process was not the equivalent of the catalytic low pressure process. It was not until 1940 that Frey first installed a plant for carrying out the process of his patent in suit. The question naturally arises, would he have done this if he really considered the sulfuric acid catalytic method the equivalent of his patent process? His answer is that he took the hard way, not the only or the best way, of achieving the results called for by his patent. This plant operated on a small scale for some four years, when, at the height of the war, it was abandoned. There is no evidence in the present case that anyone ever took any license under the Frey patent. It is important to note that Frey first began to manufacture high octane gasoline under a catalytic method in 1938, but he does not claim that he was the first to invent the sulfuric acid process. As testified by Robert C. Elderfield, Professor of Organic Chemistry at Columbia University, the inter partes neutral witness, it was not until 1944 primarily, if not entirely, as a result of the article by Bartlett and others in the Journal of the American Chemical Society, that industrial chemists skilled in the art really understood the precise nature of the sulfuric acid catalytic process.

There is no testimony whatever in the present case that anyone has ever attempted to practice the teaching of the Frey patent by reading into it the sulfuric acid process. Also it is clear from the drawings of the apparatus employed in the Frey process and in the Esso process, that if the latter were to be introduced into the former, very radical reconstruction of the apparatus would be required.

The gist of plaintiff's contention that Esso's catalytic process is the equivalent of the Frey process lies in the argument

that since polymerization,—i. e., change into another substance having the same elements in the same proportions but a higher molecular weight and different physical properties,—of olefins and alkylation of aromatics (compounds of the benzene ring) had been brought about by use of sulfuric acid catalysts prior to the Frey patent, and were well known in the art, it is a reasonable conclusion that this same catalyst was the natural thing to which to turn in order to accomplish the juncture of paraffins and olefins. However, we are satisfied that this is a nonsequitur. That the two processes are distinctly different is demonstrated by the very material differences in both the conditions under which the two processes function and the results which they produce.

It is true that there are certain conditions and results common to both processes. Claim 2 in suit defines a process for the production of higher boiling hydrocarbons from lower boiling ones which consists of three parts: (1) adding to a stream of predominantly saturated hydrocarbons, (2) maintained at a conversion temperature and pressure, (3) successive small quantities of predominantly olefinic hydrocarbons in such a manner that the content of added olefins in the mixture at no time exceeds 10 percent by weight of the total hydrocarbons present. It is true that both processes have this procedure in common. It is also true that both produce, as a main product of the reaction, a group of isomeric paraffins, i. e., each molecule of which is the exact sum of one molecule of the reactant paraffin and one molecule of the reactant olefin. Alo both produce a range of hydrocarbons, other than the main products, having numbers of carbon atoms per molecule both smaller and larger than the carbon molecule of the main product. In short, both alkylate aromatic carbons, both react with iso-paraffins, and both make use of the law of mass actions. However, these common conditions and results are greatly overbalanced by the basic fact that in the Frey process the reactions are caused by heat and pressure, whereas in the Esso process the reactions are caused by sulfuric acid.

A chart introduced in evidence on behalf of the defendant sets forth these differences in parallel columns, and the accuracy of this chart has not, we find, been refuted by any testimony introduced on behalf of the plaintiff. These differences are as follows:

Under the Frey process, the reactions are caused by heat and pressure; under the Esso process by sulfuric acid. Under the Frey process, temperature is called for ranging from 752 to 932 degrees Fahrenheit; under the Esso process the temperature is from 35 to 65 degrees Fahrenheit. Under the Frey process, pressures are from 1000 to 5000 pounds or more; under the Esso process they are atmospheric to 150 pounds. Under the Frey process, the reaction mixture must be heated; under the Esso process the reaction mixture must be cooled. Under the Frey process, reactants are compressed gases above the critical temperature and pressure; under the Esso process they are liquids. Under the Frey process, no acid is present; under the Esso process sulfuric acid is present in large volume, concentration, from 88 to 98 percent. Under the Frey process, the reaction mixture is a homogenous phase; in the Esso process there is a two-phase mixture system, vigorous agitation being necessary for effective operation. Under the Frey process, the plant embodies structural and functional features adapted to the aforegoing conditions of that process and not suitable for acid alkylation; under the Esso process, the plant embodies structural and functional features adapted specifically to the conditions just recited in the Esso process, and it is impractical, if not impossible, to use it for thermal alkylation without great remodification. Under the Frey process, normal paraffin reacts; under the Esso process, normal paraffins do not react. Under the Frey process, the reaction is not limited to iso-paraffins; under the Esso process the reaction is so limited. Under the Frey process, ethylene alkylates normal paraffins and iso-paraffins; under the Esso process, ethylene alone does not alkylate normal paraffins or iso-paraffins. Under the Frey process, high pressure is necessary, low

pressure favors undesired products; under the Esso process, pressure is not shown to have any effect. Under the Frey process, the gasoline produced is unstable under reaction conditions; under the Esso process, the gasoline produced is stable under reaction conditions. Under the Frey process, the gasoline is high in unsaturated hydrocarbons; under the Esso process it is free from unsaturated hydrocarbons. Under the Frey process, the gasoline is high in normal paraffins; under the Esso process it is free from normal paraffins. Under the Frey process, the reaction products contain products characteristic of thermal decomposition, such as hydrogen and methane; under the Esso process the reaction products are free from thermal decomposition products.

The last four differences just enumerated, i. e., the differences in the products of the two processes, demonstrate, apart from everything else, that the two processes cannot be treated as equivalents. The basic distinctions between the two processes were very clearly explained by Robert C. Elderfield, the inter partes neutral witness. His testimony has been of the greatest assistance to the Court in enabling it to understand the highly technical questions involved, and to appraise the testimony of the technical experts who testified on behalf of each party to the suit.

Professor Elderfield employed, by way of illustration, the analogy of a person desiring to travel from Baltimore to Philadelphia, with two routes available, one via Conowingo, Maryland, and the other through Wilmington, Delaware. Because of differences in the "starting" materials used in the two processes, that is, the materials first fed into the respective processes, he drew the analogy of a person who, while starting to go from Baltimore to Philadelphia might, nevertheless, leave from different parts of the city of Baltimore. Similarly, while both of the suggested routes from Baltimore to Philadelphia lead into the latter, the traveler would nevertheless necessarily enter Philadelphia at different points, depending upon which route he took. In other words, completing the analogy, Professor Elderfield explained that just as the traveler would get *into* Philadelphia by either route, the chemist would produce *an* alkylate whether he followed the Frey process or the defendant's process, but he would do so by different routes and the reaction products would not be equivalent in both cases.

■■ A claim in a patent must be construed in the light of the specifications. Thus, the Frey patent must be limited to the thermal process which is the only process described in both the specifications and claim 2. Furthermore, the doctrine of equivalents is never applicable where the alleged infringer's process is not substantially the same in means and operation as that described in the patent, even though the results achieved are identical. Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136; Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610; Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399; Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3; Wheeling Stamping Co. v. Standard Cap & Molding Co., 4 Cir., 155 F.2d 6.

■ As was said in the Universal Oil Co. case, supra, 322 U.S. 471, at page 484, 64 S.Ct. at page 1116, 88 L.Ed. 1399: "As a reward for inventions and to encourage their disclosure, the United States offers a seventeen-year monopoly to an inventor who refrains from keeping his invention a trade secret. But the *quid pro quo* is disclosure of a process or device in sufficient detail to enable one skilled in the art to practice the invention once the period of the monopoly has expired; and the same precision of disclosure is likewise essential to warn the industry concerned of the precise scope of the monopoly asserted. Béné v. Jeantet, 129 U.S. 683, 685, 686, 9 S.Ct. 428, 429, 32 L.Ed. 803; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 368, 58 S.Ct. 899, 901, 82 L.Ed. 1402."

We find nothing contrary to our conclusion in the decisions upon which counsel for the plaintiff rely, such as Union Paper-

Bag Machine Co. v. Murphy, 97 U.S. 120, 24 L.Ed. 935; Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279; Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983; Hartford-Empire Co. v. Swindell Bros. Inc., 4 Cir., 96 F.2d 227, on rehearing, 4 Cir., 99 F.2d 61; City of Grafton, W. Va., v. Otis Elevator Co., 4 Cir., 166 F.2d 816.

Lastly, with respect to the question of validity, since we have found that the Frey patent is not infringed, we are precluded on the pleadings as they stand in the present case, from passing upon the question of validity of the patent. See Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263; Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450.

A decree will be signed in accordance with the aforegoing opinion.