**ELEKTROKEMISK A/S, Plaintiff,**

v.

**The AMERICAN AGRICULTURAL CHEMICAL COMPANY, Defendant.**

**Civ. A. No. 1663.**

United States District Court
D. Delaware.

June 28, 1957.

---

Arthur G. Connolly and Thomas Cooch, Connolly, Cooch & Bove, Wilmington, Del., and Alan N. Mann and William D. Lucas; Eyre, Mann & Burrows, New York City, for plaintiff.

Robert H. Richards; Richards, Layton & Finger, Wilmington, Del., and Robert S. Dunham and Paul S. Bolger, New York City, for defendant.

LEAHY, Chief Judge.

This is an action for infringement of U.S. 2,300,355, issued October 27, 1942, for a process for the production of carbides and ferro-alloys, covered by the Ellefsen patent. Plaintiff charges defendant, The American Agricultural Chemical Company, infringes the patent by its process for the production of elemental phosphorus. The case creates two issues:

1. Is Ellefsen patent valid?

2. Did defendant's operation of its electric furnaces in the production of elemental phosphorus infringe claims 1 to 5 inclusive of the Ellefsen patent?[1]

These are the critical facts.

1. Plaintiff, Elektrokemisk A/S is a Norwegian corporation engaged for years in the design and development of types of electrochemical furnaces.[2] Elektrokemisk has patents and licenses others under its developments. It does the design and engineering work. It has built furnaces in the United States and Europe.[3] It is the owner of 2,300,355 issued to Tonnes Ellefsen for processes for the production of carbides and ferro-alloys. It acquired rights to the patent in about 1934. Ellefsen had been working on the development since 1923.[4] Defendant American Agricultural Chemical Company is a Delaware corporation. It has for years engaged in the manufacture and sale of phosphate rock, fertilizer materials, phosphorus, sodium and calcium phosphates, phosphoric acid, gelatin, ammonium carbonate and bone black.[5] In 1934, defendant built a closed electric furnace for the production of elemental phosphorus at South Amboy, New Jersey. A second furnace was built about 1938.[6]

---

1. The Ellefsen patent contains 6 claims but plaintiff's counsel conceded defendant did not infringe claim 6; R. 12.

2. Stipulation, R. 41; Sem, R. 45.

3. See Sem, R. 46, 80–83; PX 6; Walthall, TVA Dep. 104.

4. See PX 1; Sem, R. 89, 121.

5. See paragraph 2 in the Complaint and in the Answer; George, R. 249.

6. George, R. 250; DX 3,

2. A reading of the Ellefsen patent shows it speaks of electrothermic metallurgical processes. This means, as I see it, processes for making metals as distinguished from non-metals such as phosphorus. At the outset, it appears Ellefsen is limited to the production of carbides and ferro-alloys by electric furnace operations.[7,7a] The patent itself states in these particular processes, where the electrodes project into a charge of material for making the named products, difficulties arise as the operation is carried on. Furnaces develop craters in the form of incrusted pockets around the lower parts of the electrodes. These craters have a cup or tubular shape including vertical or upright walls of a sintered or solidified character. The crater walls become clogged. They become smaller, so gases are driven out in the small areas between the crater wall and the electrode. The patent calls this "blowing".[8]

During prosecution plaintiff stated the word "crater" is to be accepted for its ordinary dictionary meaning, in the sense as when applied to the "crater" of a volcano.[9] Plaintiff's witness Sem in explaining the patent stated frequent poking down of the charge was necessary to keep the operation going.[10] Processes of making calcium carbide and ferro-silicon which the patent is directed to improve, were described by the testimony of Striplin, who was familiar with the operation of carbide and ferro-silicon furnaces of the sort known before Ellefsen.[11] Plaintiff's asserted invention is in the processes of making carbides and ferro-alloys. The charge is given a slow movement relative to the electrodes, conveniently by rotating the furnace pot or bowl at a speed and under circumstances to obtain certain specified results. Electrodes are said to burn their way through the charge melting down the upright crater walls as the electrodes progress slowly relative to the charge. The patent in suit teaches the advantages of preventing clogging and blowing. It permits the tapping of molten product from beneath all three electrodes through one hole at the side of the furnace. This is, at least, one phase of the alleged invention. The electrical effect around the bottom of the crater is described as the arc, which plaintiff says means an electrical discharge through gas accompanied by light and heat.[12]

3. The purpose of defendant's process, however, discloses it is a method of producing elemental phosphorus, a non-metallic chemical element of a variety of uses, including the manufacture of phosphoric acid and several other chemicals.[13] Defendant's process for making elemental phosphorus involves smelting of a charge of phosphate rock, coke and silica (or grits) in an electric furnace where the material is heated by the electrical resistance effect of current flowing through the material without any arcs or arc discharges.[14] The electric furnace process of making phosphorus, as defendant employs it, is old. The fundamental furnace operation, i. e., using phosphate, silica or sand and carbon, was first patented about 70 years ago in modern form and, in fact, stems from chemical discoveries nearly 300 years ago.[15]

7. Ellefsen Patent (PX 1), p. 1, col. 1, lines 1 to 6. The only products mentioned in the patent, in this category, are calcium carbide and ferro-silicon. The latter is described in lines 45 to 50 of column 1, page 1 of the patent.

7a. Sem, R. 90.

8. Ellefsen Patent, p. 1, col. 1, lines 23 to 37; see also Fig. 3, Sem, R. 102, 103.

9. DX 17, p. 61, i. e., p. 8, of the amendment of Aug. 8, 1939.

10. R. 106.

11. R. 212, 215, 216, 217, 221, 222.

12. Ellefsen Patent, p. 1, col. 2, lines 32 to 34 and p. 3, col. 1, lines 35 to 47; also p. 2, col. 1, lines 16 to 19.

13. Waggaman, R. 185, 204, 205.

14. Waggaman, R. 186, 191, 192; George, R. 267; Striplin, R. 217–220; Taylor, R. 324–326.

15. DX 19, Readman No. 417,943; Waggaman, R. 190, 191.

4. In fact, defendant's development of its phosporus process commenced with its furnaces at South Amboy, New Jersey. As stated, it entered the field in 1934, with a phosphorus furnace, to which it added a second furnace of the same type a few years later. These furnaces were stationary structures. They were a deep type of furnace, where the electrodes are buried into the charge.[16] It was known, prior to Ellefsen, phosphorus furnaces should be of a deep nature, i. e., with a deeper body of raw material or charge so the phosphorus gas would be cooled as it came up from the reaction zone near the bottom.[17] As to defendant, this depth of charge constituted no problem in its phosphorus furnaces, either in the downward feeding of the charge by gravity to the reaction region, or in the passage of gas upward through all parts of the stock.[18] Electrodes in defendant's furnaces at their lower ends dipped into the melt or molten slag. No arc discharge was ever observed. Plaintiff's witness Andreae admitted it could have been seen if it were there.[19]

5. In 1950, economic conditions led defendant to consider moving its phosphorus-producing operations to Pierce, Florida, where its source of raw material (phosphate rock) was located. Defendant's technical men had been in consultation with engineering personnel at the Tennessee Valley Authority which had been operating phosphorus furnaces. It was learned TVA had been experimenting with a pilot plant furnace wherein a rotating operation was employed. There was correspondence and communication between TVA and defendant. TVA had some trials to see whether the material which defendant had been successfully using in its stationary furnaces could be employed in a rotating furnace.[20] In the meantime plans for defendant's furnace in Florida had gone forward. It was designed as a staitonary furnace with a deeper hearth in order to provide better cooling of the gaseous phosphorus product.[21] Defendant later considered the possibility of rotation of the furnace in order to prolong the life of the furnace lining. It decided to modify the design of the furnace to include the rotating feature.[22] Defendant then started to design its own arrangement of seal between the stationary roof and rotating hearth which was different from that of TVA. Defendant utilized a different rotating mechanism. The latter was commercially available. It was a form of turntable which defendant had been employing for certain other mining machinery.[23] Defendant's rotatable furnace was built. Defendant put it into operation for the process of producing elemental phosphorus in 1952. This furnace was operated for four to six months in a stationary condition, and then the rotating operation was tried and thereafter utilized, at extremely slow speeds (from 144 to 200 hours for the equivalent of a complete rotation). Despite difficulty because of appreciable side pressure on the electrodes, rotative operation was continued, until some time before the trial of the case here, when because of mechanical difficulty the furnace was again returned to operate in a stationary condition.[24] In contrast to the slow speeds

16. George, R. 250, 255–260; DX 3.

17. Waggaman, R. 198, 199; Striplin, R. 222, 223; George, R. 266.

18. Taylor, R. 323, 526, 527.

19. Taylor, R. 315, 318, 322, 324, 356, 524, 527, 528; Waggaman, R. 198; Andreae, R. 442.

20. Hardin, TVA Dep. 59–62; Walthall, TVA Dep. 127–129; Striplin, R. 214; George, R. 270; Striplin, TVA Dep. 188–193.

21. George, R. 266.

22. George, R. 269, 270, 286; Taylor, R. 333.

23. George, R. 270–272; Taylor, R. 300, 301, 336.

24. George, R. 275; Stipulation, R. 42; Taylor, R. 314, 316–318, 332, 333, 342–344, 361.

of defendant's furnace, Ellefsen calls for a range of speeds of one revolution in 24 to 85 hours. Manifestly defendant's speed of rotation, which at its preferred rate of 200 hours, is considerably slower than half the slowest speed specified by Ellefsen. It can hardly be said to be within the teaching of the patent in suit. Operation of defendant's phosphorus producing process with one rotation in 144 to 200 hours is the same as with the stationary furnaces previously used at South Amboy and also with the type of furnace in Florida.[25] There was little blowing in either type of furnace or operation; if the charge being fed is abnormal a blow may occur because of bridging from too much coke in the charge.[26] In none of defendant's furnaces are craters as described in the processes of the Ellefsen patent for making calcium carbide and ferro-silicon.[27] In none of defendant's furnaces was there any substantial quantity of "dead" charge, lessened or affected in any way by the movement.[28] There is no channeling of gas around the electrodes or elsewhere.[29]

While the evidence suggests the rotating furnace was a little less efficient than the stationary furnaces, statistical information in this respect is insufficient for me to draw any conclusion.[30] The basic fact is the sought product of defendant in the phosphorus process is elemental phosphorus itself. The furnace must be closed and sealed as air-tight as possible, with careful regulation of the gas pressure and conditions inside the furnace.[31] Ellefsen shows a shallow open furnace having no description of any process that would require a closed furnace or a sealed one. The only type of seal which plaintiff's engineers suggested, after the patent issued, was a so-called sand seal, that would be inoperative for a rotating furnace to produce phosphorus.[32]

In the phosphorus process, the phosphate rock employed contains a small amount of iron oxide, as an impurity (representing less than 1% iron). Special treatments are utilized to reduce this impurity. All phosphorus furnace operators agreed it was desirable to have no iron impurity present.[33] In fact, plaintiff's witness Sem admitted it important, in making phosphorus, to reduce the iron content as much as possible;[34] plaintiff's Andreae agreed.[35] Because of the iron impurity in phosphate, the iron oxide is converted to iron, which absorbs a small amount of the phosphorus, thus robbing defendant's operation of its intended product. The result is a deposit beneath the body of the melt (which is the slag material remaining from the chemical operation whereby phosphorus is separated). There results a small amount of so-called ferro-phosphorus.[36] In defendant's furnaces, some amounts of this ferro-phosphorus are discharged with the slag when the latter is tapped.[37] To avoid a total economic loss from defendant's operation, this quantity of ferro-phosphorus is sold. But there can be no dispute it would be more profitable

25. Taylor, R. 324, 333.

26. Taylor, R. 319, 320, 333, 338, 339; George, R. 263–265.

27. Taylor, R. 339, 341, 342, 354, 355.

28. The Ellefsen patent speaks of the "dead" charge at p. 3, col. 1, lines 50–53, and of "solid charge" at p. 2, col. 2, lines 16 to 26. However, Taylor states defendant's charge was loose. R. 322, 339, 341, 342, 358, 363–4.

29. George, R. 263–4; Taylor, R. 320–323, 333, 341, 358, 363–4, 526, 527.

30. George, R. 279–281.

31. Waggaman, R. 185, 187, 197–199; George, R. 264; Taylor, R. 310, 311, 356.

32. Sem, R. 128; George, R. 273; Taylor, R. 301.

33. Stipulation, R. 43; Waggaman, R. 201; Striplin, R. 230–232; George, R. 262, 284; Hardin, TVA Dep. 72.

34. R. 115.

35. R. 161.

36. Waggaman, R. 189, 198, 201.

37. George, R. 281, 282; Taylor, R. 302–304.

948

if its phosphorus content could be recovered in the desired elemental form.[38] As stated before, defendant is conducting a process for the manufacture of phosphorus. It is not a process for producing a ferro-alloy as envisioned by plaintiff's patent. Only about 7 pounds of ferro-phosphorus (containing about 25% phosphorus) on an average, are recovered for each ton (2,000 pounds) of phosphate material charged, or for about each ton and a half (about 3,000 pounds) of the total materials introduced into the furnace.[39] The crux of defendant's process is one for making phosphorus. Thermal reactions and furnace operations occurring are those leading to the yield of elemental phosphorus. Any action, within the furnace, that leads to ferro-phosphorus is of a trivial sort from an infringement viewpoint.

6. Evidence shows the history of the prosecution of the Ellefsen patent. Ellefsen's original patent application was filed June 24, 1936, presumably based on a Norwegian application filed July 3, 1935.[40]

The Patent Office proceedings demonstrate conclusively Ellefsen excludes processes for producing phosphorus.[41]

7. Defendant's process is different from the Ellefsen process. The ends of the electrodes in defendant's furnace dip into and are held in contact with the melt within the meaning of the term "melt" of Ellefsen.[42] There are limitations in each of claims 1 to 4 of the patent that "each electrode * * * is held out of contact with the melt at the bottom of the furnace hearth". Plaintiff's definition of "melt" is the calcium carbide or ferro-alloy (and not slag) and is to be found on page 2, column 2, lines 55–58 of the patent. Hence, both of plaintiff's witnesses Sem and Andreae testified because of this statement, the word "melt" in the patent means the metal (or carbide), and does not include non-metallic slag.[42a] An answer to plaintiff's definition of "melt", as meaning only the metal at the bottom of the furnace, is, plaintiff took a contrary position before the Patent Office and is now estopped to say that "melt" relates merely to molten metal.[43]

8. As found before, defendant's furnace does not employ arc heating; no arc of any kind has ever been observed.[44] The same is true of similar furnaces operated by TVA.[45] Moreover, in defendant's furnace no craters are formed through the charge; and, there is no clogging of crater walls.[46] I conclude the charge used by defendant in the production of phosphorus results in a different process than the process described by Ellefsen. The charge in defendant's furnace forms a slag,[47] into which the electrodes dip;[48] and there is no arc;[49]

38. George, R. 262, 282–285. See also Sem, R. 115; Andreae, R. 161; Waggaman, R. 201; Striplin, R. 232; Hardin, TVA Dep. 72.

39. Waggaman, R. 185–189; George, R. 279, cf. 282, 284; Taylor, R. 343; Stipulation, R. 42.

40. DX 17, p. 7; DX 18; DX 17; DX 17, pp. 6, 8; DX 17, pp. 9–11; see the patents in DX 19 to Moore No. 1,378,972 for brass and zinc, cited by the Patent Office; DX 17, p. 8; Eldridge No. 2,045,073 for aluminum, cited in DX 17, p. 31; Benjamin No. 1,314,384 for steel; and Eyermann No. 1,189,356 for iron, cited in DX 17, p. 8; DX 17, pp. 23–30; DX 17, pp. 43, et seq.; DX 17, p. 47; DX 19; DX 17, pp. 51–53; DX 17, pp. 58–60; DX 17, p. 61; DX 17, p. 69; DX 17, pp. 69, 70; DX 17, pp. 82, 83; DX

18, pp. 14–15; DX 18, pp. 1, 10–13; Sem, R. 110; compare DX 17, pp. 2–5, as filed with DX 18, pp. 1–9.

41. DX 17; DX 18.

42. Taylor, R. 315, 318, 322, 324, 325, 355, 356.

42a. Sem, R. 453; Andreae, R. 436–437.

43. DX 17 and DX 18; DX 17, pp. 51–53.

44. Taylor, R. 326, 327, 355, 356, 523, 524.

45. Striplin, R. 216–218.

46. Taylor, R. 323, 338, 339, 341, 342.

47. Waggaman, R. 198.

48. Taylor, R. 315, 318, 322, 324.

49. Taylor, R. 326, 327.

or craters formed by an arc;[50] and the charge remains in a loose condition throughout the furnace.[51] Plaintiff's witness Sem conceded defendant's charge was porous,[52] and heating could be effected by the electrodes extending into the slag.[53]

9. The master facts show craters are not formed in defendant's furnace, and there is no arc by which the electrodes may burn their way through the charge as in Ellefsen.[54] This establishes defendant's process is, at bottom, different from that of Ellefsen. The evidence shows defendant's process is the same as is used since 1934,[55] with the addition of slight rotation of the furnace against appreciable side pressure on the electrodes;[56] the slow movement of the electrodes through the charge is accomplished not by an arc burning a path as in Ellefsen, but by the constant up and down movement of the electrode in the loose charge and by its gradual descent in the furnace.[57]

### Evaluation of the Facts and Applicable Law

██ 10. Actual significance of limitation to carbide and ferro-alloy processes is found in Ellefsen. Facts prove the Ellefsen patent has not been infringed by defendant's process for making elemental phosphorus. Plaintiff had the burden of proof.[58] As I see it, it failed to carry that burden. The patent is directed to a particular metallurgical process—by its title, a "Process for the Production of Carbides and Ferro-Alloys",—and, it is not a patent for apparatus or equipment such as covering a particular kind of furnace. The evidence shows plaintiff said this to the Patent Office many times. There can be no dispute, under patent law, this is an unequivocal limitation of the invention. Express restrictions in patent claims cannot be disregarded.[59] Recital of any process, to which the invention is claimed, has been considered so critical, the patent authorities will restrict it beyond the mere wording of the claims, where necessary to arrive at a meaningful expression of the invention.[60] This doctrine obviously is designed to give necessary effect to wording deliberately selected by patentees. This is to protect members of the public in their reliance on the plain language of patent claims, as to what does or does not come within the patent.[61] The ratio is basic. Its application to the present litigation is clear. Production of phosphorus is not the production of a carbide or a ferro-alloy. And, elemental phosphorus is not a carbide or a ferro-alloy;[62] the production of the former is not the production

50. Taylor, R. 320, 321, 339, 341, 342.

51. Taylor, R. 322, 339-341, 359.

52. R. 77.

53. R. 453, 476.

54. P. 1, col. 2, lines 32 to 34 and p. 3, col. 1, lines 36 to 40.

55. Taylor, R. 324.

56. Taylor, R. 314-318, 342, 343, 360-362.

57. Taylor, R. 315, 347; Walthall, TVA Dep. 115, 116.

58. Fried, Krupp Aktiengesellschaft v. Midvale Steel Co., 3 Cir., 191 F. 588, 591.

59. National Fruit Products Co., Inc., v. C. H. Musselman Co., D.C.M.D.Pa., 8 F. Supp. 994.

60. Phillips Petroleum Co. v. Shell Oil Co., Inc., 5 Cir., 166 F.2d 384.

61. Republic Iron & Steel Co. v. Youngstown Sheet & Tube Co., 6 Cir., 272 F. 386.

62. R. 137-38.

of either of the latter. Neither counsel nor court need labor the obvious.

11. Plaintiff argues the thesis the art would understand a "process for the production of carbides and ferro-alloys" as embracing the electric furnace process of making phosphorus. I have concluded furnace processes for making phosphorus cannot be classed as ferro-alloy processes. Manufacture of elemental phosphorus by smelting a charge of phosphate rock, silica and coke, in an electric furnace, has been known, as stated before.[63]

12. The patentee, here, should not assume a process for the production of ferro-alloys as including a phosphorus-making process because of the effect in the latter of a small amount of iron; which has no use for making phosphorus;[64] which is entirely unwanted;[65] and is admittedly sought to be avoided;[66] and, if added, "would be a waste of your product", i. e., of phosphorus;[67] and which simply exhibits its undesirable characteristic that "plagues the phosphate industry as a whole",[68] and "robs your phosphate of the phosphorus that you want".[69] Plaintiff expressly limited the patent and its claims to the production of carbides and ferro-alloys. It necessarily excluded the furnace process for making phosphorus, with or without a small by-product of ferrophosphorus. The phosphorus process is clearly outside the patent. Plaintiff should not now drag it within the ambit of his patent claims by pointing to the impurities found in defendant's process. The occurrence of ferrophosphorus in defendant's operation cannot make it an infringement of Ellefsen.

### Formal Findings of Fact of Non-Infringement of Claims

█ Defendant's process for the production of elemental phosphorus which results in the production of small amounts of ferrophosphorus is not, in fact, a procedure defined in claim 1 of Ellefsen.

This finding is demonstrated by comparison of wording of claim 1 of Ellefsen, with evidence of defendant's process.

| Words of Claim 1 | Defendant's Process |
| --- | --- |
| "In the production of carbides and ferro-alloys * * *" | Defendant's process is not a process for the production of carbides and ferro-alloys but is a process for production of phosphorus and is beyond the scope of claims. |
| "* * * by smelting a suitable charge * * *" | The charge used by defendant is not a "suitable charge" for the production of carbide and ferro-alloys. |

63. Readman patent No. 417,943, DX 19; Hardin, TVA Dep. 72; Waggeman, R. 192, 193; DX 22; DX 25; R. 122; R. 122, 123; DX 24; DX 23; R. 133, 134; R. 142; R. 161, 162; R. 157, 159; R. 157-8; R. 122.

64. Sem, R. 109.

65. R. 262, 284; "a loss of phosphorus as product", Striplin, R. 232.

66. Sem, R. 115; Andreae, R. 161; Walthall, TVA Dep. 122, 123.

67. Andreae, R. 162.

68. Hardin, TVA Dep. 72.

69. Waggaman, R. 201.

"* * * in an electric furnace adapted for continuous operation and provided with one or more electrodes, the electrothermic process which includes during the continuous operation of the furnace the steps of energizing each electrode with alternating current, supplying the furnace with the raw material to be smelted, effective relative movement between the charge and each electrode by relative movement between each electrode and the furnace hearth * * *"

These steps are used in the process of defendant's furnace. They are also the same steps which were used in defendant's stationary furnaces except for the movement of the electrode relative to the charge which is a well-known expedient characterized by Ellefsen's attorney as "* * * very, very old" DX 17, p. 65.

"* * * regulating and positioning each electrode so that each electrode extends through and is surrounded by the charge for a substantial portion of its length above the smelting zone and is held out of contact with the melt at the bottom of the furnace * * *"

Defendant's electrodes are not held out of contact with the melt, but rather they dip into the melt.

"* * * preventing the clogging of the pores of the new craters continuously formed around the lower end of each electrode by suitably regulating the speed differential between the electrode and the charge so that each electrode travels very slowly through the charge at a speed depending upon the rapidity of the vertical descent of the materials in the craters so that such electrode can form a path through the charge * * *"

Defendant's operation does not prevent clogging of anything since the gas escape is the same with or without rotation. If this means rotation at a speed sufficient to prevent clogging, defendant's one rotation in 144–200 hours is not such a speed.

There are no craters formed in defendant's process around the lower ends of the electrodes. There is no formation of a path through the charge by an arc "burning" through the charge as taught by the Ellefsen patent, p. 1, col. 2, lines 32–34 and p. 3, col. 1, lines 36–38.

"* * * without the development of appreciable side pressure on the electrode and thereby tending to prevent blowing of the furnace, * * *"

Defendant's electrodes are subjected to side pressure even at the extremely slow rate of rotation used by defendant.

There is no proof defendant's speed, as slow as one rotation in 200 hours, would be sufficient to prevent blowing of the furnace if crater conditions existed in the furnace. Defendant's rotation has no effect on blowing whatever.

"and tapping off the liquid smelted product directly from the furnace hearth as the smelting is completed, substantially as described."

In defendant's process, the "product" is not tapped off as a liquid, but rather defendant's product is removed from the furnace as a gaseous vapor. This is a difference of importance because it denotes the distinctive process of defendant which requires an airtight furnace, the control of the off-gas temperature, as well as requiring a lower melting point in the furnace, which is achieved by the use of resistance heating of the molten material rather than the high temperatures resulting from arcing.

2. Defendant's process for the production of elemental phosphorus resulting in production of small amounts of ferrophosphorus, is not, in fact, the process defined in claims 2, 3 and 4 of Ellefsen. Claims 2, 3, and 4 have substantially the same recital as claim 1. Defendant's process for the production of elemental phosphorus which results in production of small amounts of ferrophosphorus is not the same process defined in claim 5 of Ellefsen.

| Words of Claim 5 | Defendant's Process |
|---|---|
| "In the production of carbides and ferro-alloys by smelting a suitable charge in an electric furnace adapted for continuous operation and provided with one or more electrodes, the electrothermic process which includes during the continuous operation of the furnace the steps of energizing each electrode with alternating current, supplying the furnace with the raw material to be smelted so that each electrode extends through and is surrounded by the charge for a substantial portion of its length above the smelting zone * * *" | The words of this first portion of claim 5 correspond to the similar portions of claims 1 to 4. The language, in fact, appears to be a combination of the language of claims 1 and 2. Defendant's process is distinguishable from this portion of claim 5 on the same grounds defendant's process is distinguishable from claims 1 to 4. |
| "* * * and very slowly moving each electrode sideways through the charge at such a speed that no appreciable side pressure will develop on the electrode but the craters will move through the charge to form continually changing crater walls and thus prevent the furnace from blowing." | The second portion of claim 5 again emphasizes the difference between defendant's process and that of the Ellefsen patent, for defendant's electrodes are subject to appreciable side pressure even at the extremely slow rates of rotation used by defendant. Defendant's speed of rotation (200 hours per revolution) is insufficient, and the conditions are such, that the step of rotating to prevent blowing is not performed. |

As it is so plain defendant's process in producing elemental phosphorus in a rotating furnace does not infringe Ellefsen, it hardly seems necessary to probe into the question of validity. I shall presume the patent in suit is valid. This presumption has the imprimatur of the Patent Office itself. Once non-infringement has been clearly established, I leave validity for some other court. As for the case at bar, I think defendant's defense of non-infringement has been more than sustained. Hence the

Formal Conclusions of Law are:

1. Defendant's process for the production of elemental phosphorus in its rotating furnace does not infringe any of the claims of the Ellefsen patent No. 2,300,355.

2. The validity of Ellefsen patent No. 2,300,355 is not decided.

An order may be submitted.