George M. MOONEY, Plaintiff,

v.

BRUNSWICK CORPORATION,
Defendant.

No. 74–C–323.

United States District Court,
E. D. Wisconsin.

March 21, 1980.

The two patents in suit are United States Patent No. 3,245,280 ('280) and United States Patent No. 3,248,782 ('782). The first patent, '280, is entitled "Integral Gear" and is directed to a one piece ratchet clutch and bevel gear unit. (See appendix 1) The other patent, '782, is entitled "Method of Making a One Piece Integral/Composite Gear" and is directed to the method of making the one piece gear described in '280. (See appendix 2) The plaintiff alleges the defendant infringed Claim 4 of '280 and claim 1 of '782 because of its manufacturing, sale, and use of a one piece integral ratchet clutch and bevel gear in its outboard motors and because the method of producing those gears infringes on the plaintiff's patents. Plaintiff also alleges that defendant willfully and deliberately infringed on plaintiff's patents.

The defendant alleges that there is no infringement of Claim 4 of '280 and that '280 is invalid because it was obvious to one skilled in the art when the Patent Office granted the patent. Defendant also contends that its method of producing gears does not infringe on Claim 1 of '782 and that '782 is also obvious. In addition, defendant asserts numerous other defenses including invalidity of both patents under 35 U.S.C. § 112 contending the specifications of the claims are inadequate.

On February 26, 1979, an eight-day court trial began, and at its conclusion, the Court took the matter under advisement. This memorandum and order constitute the Court's findings of fact and conclusions of law as required under Rule 52 of the Federal Rules of Civil Procedure.

Richard O. Bartz, Burd, Braddock & Bartz, Minneapolis, Minn., for plaintiff.

Glenn O. Starke, Andrus, Sceales, Starke & Sawall, Milwaukee, Wis., for defendant.

## MEMORANDUM AND ORDER

WARREN, District Judge.

## I. INTRODUCTION

The plaintiff, George M. Mooney (Mooney), has brought this action against the defendant Brunswick Corporation (Brunswick), for alleged infringement of two patents owed by the plaintiff. Mr. Mooney, the inventor of the patents in the suit, is a resident of Minnesota and president of Capitol Gears, Inc. of St. Paul, Minnesota. Brunswick is a Delaware corporation, and its subsidiary, Mercury Marine Division, is located and has its place of business in Fond du Lac, Wisconsin. The Court has jurisdiction under 28 U.S.C. § 1338 because the alleged acts of infringement occurred in this district and venue is proper. 28 U.S.C. § 1400(b).

## II. BACKGROUND

Sometime shortly before 1960, the defendant's predecessor, Kiekhaefer Corporation, began to purchase certain clutch and bevel gear units from Capitol Gears Corporation because its primary supplier had encountered labor difficulties. At that time, Kiekhaefer was engaged in the manufacture and sale of outboard and stern drive motors. The particular clutch and bevel

gear units purchased from Capitol Gears were used to drive the horizontal propeller in the outboard and stern drive motors. Because the motor in both systems drives a vertical shaft, beveled gears are necessary to transmit the power to the horizontal propeller shaft. In the outboard motor only a single set of beveled gears are necessary; in the stern drive motor, two sets of beveled gears are necessary. Each set of beveled gears incorporates a forward and a reverse gear. At the bottom of the verticle drive shaft is a pinion gear which meshes with the bevel gears. When the clutch which is on the propeller shaft is moved forward, it engages the latch clutch contained within the forward bevel gear which causes the propeller to rotate in a clockwise direction and propel the boat forward. Conversely, when the clutch is moved in the opposite direction, it engages the ratch clutch contained in the other bevel gear and the boat moves in the reverse direction.

Prior to 1962, the bevel gear and ratch clutch units were two-pieced units which were brazed and/or pinned together. These units were described in the uncontested statement of facts as:

[T]wo pieces of metal, brazed together, and included an unobstructed annular ring of a plurality of gear teeth disposed about the axis of rotation of said unit and an annular ring of a plurality of arcuate sloping ratchet teeth concentric with and within the inner periphery of said ring of gear teeth, said ratchet teeth being recessed relative to said gear teeth, each of the ratchet teeth having a generally radial engaging face extending generally along a line passing through said axis of rotation, the engaging face of each of said ratchet teeth being inclined inwardly from the ridge of each of said teeth by up to about 8°. (¶ 19 Stipulation of Facts)

When Kiekhaefer began purchasing from Capitol Gears, Capitol had already been selling such gears to other corporations including Chrysler, West Bend, Scott-Atwater, McCullough, Aero Marine and Homelite. (Tr. 65). As the horsepower in the outboard motors increased, the companies experienced more failures with the brazed and pinned gears. The higher horsepowered motors placed greater stress on the two piece gears and the brazings would not hold. The initial reaction to these failures was to pin the brazed gears, but even the pinning did not appear to be effective in all cases. (Tr. 57, 60, 66, 325, 362).

In June of 1962, the plaintiff, who was president of Capitol Gears and who was personally aware of the failures of the brazed gears, conceived of the idea of producing a one piece gear to remedy the problem with the brazed gears. The plaintiff testified that when he got the idea he immediately contacted a patent attorney and arranged to apply for a patent. He also called the defendant's predecessor and informed them he thought he could develop a method for producing a one piece gear and the gear itself. Enthusiastic with the prospects of solving their gear problem, the defendant sent one of its employees, Mr. Schwamb, to assist the plaintiff. Mr. Schwamb, however, was not skilled in any technical area and, therefore, only assisted Mr. Mooney by handing him tools and stripping wires.

During the eight-week period after Mr. Mooney contacted a patent lawyer and informed the defendant of his idea, he worked day and night developing the one piece gears. At the end of the eight weeks, Capitol Gears began to produce the one piece gears and to fill orders for the defendant. Mr. Schwamb returned to the defendant's plant with some samples which the defendant tested. The test results demonstrated the superiority of the one piece gears.

On January 14, 1963, the plaintiff filed his application for a patent on the gear and the method of production. Subsequently, the Patent Office ruled that the application covered two separate claimed inventions and, therefore, the application must be restricted to only one of the claimed inventions. The plaintiff elected to restrict the application to the method of production and filed a divisional application for the gear patent. On April 12, 1966, the Patent Of-

fice granted the plaintiff U.S. Patent No. 3,245,280 on the integral gear, and on May 3, 1966, the Patent Office issued U.S. Patent No. 3,248,782 to the plaintiff for the production process method.

U.S. Patent No. 3,245,280 has four claims. The fourth claim, however, is the only one in issue in the lawsuit. Claim 4 states:

4. As a new article of manufacture, a once piece integral composite gear and clutch adapted for rotation about an axis, said gear and clutch including an unobstructed annular right of a plurality of gear teeth disposed about said axis of rotation and an annular ring of a plurality of arcuate sloping ratchet teeth concentric with and within the inner periphery of said ring of gear teeth, said ratchet teeth being recessed relative to said gear teeth, each of said ratchet teeth having a generally radial engaging face extending generally along a line passing through said axis of rotation, the engaging face of each of said ratchet teeth being inclined inwardly from the ridge of each of said teeth by up to about 8°. (PX 28).

As the diagram in appendix 1 indicates, the patented device is basically a one piece beveled gear with a recessed ratchet toothed clutch. The ratchet teeth of the clutch are sloped at approximately an 8° angle from the ridge. Although six ratchet teeth are shown in the diagram, the patent is not limited to that number.

In granting the patent, the Patent Office examiner only referenced one prior art patent. That patent was Kauffman Patent No. 2,289,288 (Kauffman '288). Kauffman '288 describes a bevel gear with sloping ratchet type clutch teeth in its center. The Kauffman '288 does not, however, indicate whether the gear and clutch mechanism was in one solid unit or two bound together in some manner. (PX 44).

U.S. Patent No. 3,248,782 has two claims. Only Claim 1 of the patent is alleged to be infringed by the defendant's process. Claim 1 provides:

1. A method of making a one piece integral/composite polyfunctional toothed working part adapted for rotation about an axis and having at least two concentric annular rings of teeth disposed about that axis, one of said rings of teeth being unobstructed by any portion of said working part and another of said rings of teeth being recessed with respect to said first ring of teeth, said method comprising forming a work piece by machining metal stock to outline shape, cutting said recessed teeth by rotating a rotatable cutting tool having an end cutting face in contact with the blank work piece and moving said work piece relative to the end cutting tool in one direction and rotating a rotatable cutting tool having side edges cutting faces in contact with said work piece and moving said work piece relative to the side cutting tool in another direction to delineate said teeth, and cutting said unobstructed teeth by revolving edge cutters of a gear cutter in contact with the blank work piece and moving said work piece relative to the gear cutter to delineate said teeth. (PX 29).

Figures three and four of diagram one illustrate the method used in producing the ratchet teeth of the clutch. After a piece of metal stock is machined to outlined shape, the work piece is placed in a jig at a desired angle corresponding with the cutting tool in figure four. While rotating about its axis, the cutting tool then cuts the ratchet tooth surface. The work piece then moves in a rotational movement about its axis in an ark depending on the number of desired ratchet teeth. The cutting tool number 27 in figure four demonstrates the manner in which the engaging faces of the ratchet teeth are formed. The cutting tool has side edge cutting faces. The cutting tool and the work piece are moved relative to one another along a path lying generally along a radius of the work piece. Figure three illustrates the direction of the side edge cutting tool (number 27).

In granting this patent, the Patent Office examiner referenced four other patents as relevant prior art. These four patents were; Ferguson Patent No. 840,055 (Ferguson '055); Riley Patent No. 1,859,171 (Riley '171); Peterson Patent No. 2,062,927

(Peterson '927); and Friend Patent No. 3,100,333 (Friend '333). Ferguson '055 and Riley '171 both describe change speed gears with two sets of teeth of which one set is used for clutch teeth. (DX 238(1)(2)) The Peterson '927 patent describes the method for producing a "helical gear with teeth at one end parallel to the axis of the gear and formed from the end portion of the helical teeth." (DX 238(3)) The helical teeth and parallel clutch gear teeth are on the exterior of the work piece. The clutch teeth are parallel to the gear's axis. These parallel teeth are formed from the ends of the helical teeth with an annular groove between the two sets of teeth. Friend '333 describes a method of making a compound gear. The patented method provides for the independent machining of the two separate gear bodies and then, the joining of the gear bodies together. The most unique feature of this patent is the method of joining the gear bodies not the machining of the bodies.

At the time that Mr. Mooney had completed the production of the one piece gear in 1962, the defendant Brunswick was purchasing all of its gears from either Capitol Gears or another gear manufacturer in Chicago. According to Mr. Alexander, vice president of Brunswick Corporation, in 1966, the defendant began to manufacture some of its own gears to maintain a competitive edge in the market place. Initially, the defendant began its excursion into gear making with the production of small two piece gears. Mr. Alexander also testified that defendant hired Roger Shine sometime toward the end of 1965 to oversee the development and manufacture of gears for the defendant. (Tr. 798–99). Mr. Shine testified that the defendant began producing one piece gears sometime in 1968. Mr. Shine testified that the defendant hired Precision Design, Inc. to design the gear machine and Acar Machine Company was contracted to manufacture it. (Tr. 835–836). Sometime after Mr. Shine arrived and the Acar Machine was installed, the defendant began to manufacture one piece bevel gears and ratchet clutches. Pursuant to the Court's pretrial order, the parties have agreed on the basic description of the defendant's one piece gear:

15. The Defendant's one-piece integral ratchet clutch and bevel gear includes an unobstructed annular ring of a plurality of gear teeth disposed about an axis of rotation and a ring of ratchet clutch teeth located within the periphery of the ring of gear teeth. The ratchet teeth are recessed relative to the gear teeth. Each ratchet tooth has a generally radially engaging face which extends generally along the line passing through the axis of rotation of the gear.

16. Some of the ratchet clutch and bevel gears made by the Defendant have ratchet teeth with engaging faces that are inclined inwardly from the ridge of the teeth by an angle of between 3–8°.

As a result of defendant's manufacture of the one piece gear, the plaintiff instituted this suit. It is to be noted, however, that even though defendant manufactured its own gears it continues to this day to purchase both one and two piece gears from the plaintiff.

*Patent '782*

As stated earlier, the plaintiff alleges that the defendant's method of producing its one piece gears infringes on Claim 1 of patent '782. The defendant raises four defenses in response. Defendant contends: that its method of production does not infringe on Claim 1 of '782; that Claim 1 is invalid under 35 U.S. § 112 because it lacks sufficient information for making the product and fails to set forth the best mode of production; and that Claim 1 is obvious under 35 U.S.C. § 103.

As recounted earlier, Claim 1 encompasses the following four-step procedure:

(1) a piece of metal stock is machined to outline shape,

(2) the recessed ratchet teeth are cut by "rotating a rotatable cutting tool (end mill) having an end cutting face in contact with the blank work piece and moving said work piece relative to the end cutting tool in one direction (PX 29);

(3) the engaging faces of the clutch are then produced by "rotating a rotatable cutting tool having side edge cutting faces in contact with said work piece and moving said work piece relative to the side cutting tool *in another direction* to delineate said teeth." (PX 29);

(4) finally, the unobstructed gear teeth are machined by "revolving edge cutters of a gear cutter in contact with the blank work piece and moving said work piece relative to the gear cutter to delineate said teeth." (PX 29).

Defendants assert that their method of producing gears is substantially different from plaintiff's, especially in two aspects. Defendant contends that, because it uses forgings instead of metal stock, the first step of '782 is not infringed. In addition, the defendant asserts that its method of cutting the ramp and engaging faces of the recessed gears does not involve the movement of the cutting tool in two different directions relative to the work piece or the relative movement of the work piece in two different directions as required by the plaintiff's patent.

According to defendant, their Acar Milling machine is a rotating table with four indexers or stations. (PX 64) At station one, the forgings used by the defendant are loaded and unloaded. At station two, engaging faces of the ratchet clutch teeth are milled by a side mill side cutting tool which moves radially from the center of the work piece. The side mill rotates about its own axis and the work piece is indexed about its axis to allow for the production of each engaging face. At station three, the sloping ramps of the ratchet clutch teeth are milled with the end surface of an end mill rotating about its axis and moving in a radial direction. Again, the work piece is indexed about its axis so each ramp may be milled. At station four, the edges of the ratchet teeth are chamfered. (PX 65).

Plaintiff and defendant agree on most points as to the operation of the Acar machine. The only disputes are whether the cutting tools move in the same direction at station two and three or in different directions and the effect of the defendant's use of a forging.

■ Section 271(A) of Title 35 of the United States Code provides: "Whoever without authority makes, uses, or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." To prove that the defendant has infringed on patent '782, the plaintiff must demonstrate that there has been an "unauthorized performance of substantially the same process steps in substantially the same way to accommodate substantially the same result." *International Glass Company, Inc. v. United States,* 408 F.2d 395, 400, 187 Ct.Cl. 376 (1969); *see Tilghman v. Proctor,* 102 U.S. 707, 26 L.Ed. 279 (1880); *Goodyear Dental Vulcanite Company v. Davis,* 102 U.S. 222, 26 L.Ed. 149 (1880); *Engelhard Industries, Inc. v. Research Instrumental Corp.,* 324 F.2d 347 (9th Cir. 1963) *cert. denied* 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964). The accomplishment of the same result is not sufficient to prove infringement; the method must also be the same or substantially the same. *See Linde Air Products Company v. Graver Tank and Manufacturing Company,* 167 F.2d 531 (7th Cir. 1948) *modified* 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949) *affirmed* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The use of different materials in the same process does not, however, shield an infringer from liability if the materials are equivalent. *International Glass Company, supra.*

■ In determining infringement, however, the Court is bound by the language of the claim in suit. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Ransburg Electro-Coating Corp. v. Nordson Corp.,* 293 F.Supp. 448 (N.D.Ill.1968). Nor, may the Court ignore any expressed restrictions in the claim itself. *Elektrokemisk A/S v. American Agricultural Chemical Company,* 152 F.Supp. 944 (D.Del.1957).

The defendant argues that the Claim 1 .of '782 states two restrictions which the patent is bound by and which are not

present in its process. These two restrictions are the machining of the metal stock to outline form and the movement of the cutting tool in different directions.

### Forgings

Claim 1 of '782 states that "a workpiece is formed by machining metal stock to outline shape." (PX 29) At trial the plaintiff introduced a portion of metal stock (PX 32) which represented the type of metal bar stock used. Plaintiff also introduced diagrams and exhibits which detailed the preparation process for the defendant's forging. According to plaintiff's witness, Attorney Westman, plaintiff's exhibits 57, 58 and 60 depict the areas of the forging which are machined before the gears are cut. (Tr. 617–621) Plaintiff also introduced sample forgings in different stages of machining. Comparing defendant's exhibits 55 and 56 with defendant's exhibit 246, which is a raw forging, it is apparent that some machining is done. It is important to note, however, that, even on the finished product (DX 249), there are portions of the forging that are not machined. Attorney Westman testified that the machining done prior to the milling on the Acar machine was within Claim 1 of '782.

Doctor Bollinger, who was defendant's principal expert witness, testified that the forging used by the defendant was already beyond the "outlined shape." (Tr. 910) Doctor Bollinger emphasized that the forging was a very important aspect of defendant's process because it provided the necessary tool clearance to make the ramp surfaces with the end mill cutter. (Tr. 410) According to Doctor Bollinger, without the forging, the defendant could not produce its gears in the manner it did.

At the outset, the Court notes that at trial and in its post trial briefs, the defendant devoted considerable time and space to its discussion of the weight this Court should give to the testimony of Mr. Westman, who is a patent lawyer. Defendant cites *National Dairy Products Corporation v. Borden Company*, 394 F.2d 887 (7th Cir. 1968) for support of its position that Mr. Westman's testimony as to obviousness and infringement should be given no weight. In *National Dairy Products Corporation, supra*, the court implied that the testimony of a patent lawyer not skilled in the art was not sufficient to sustain a finding of obviousness by the district court. Defendant's interpretation of the court's statement in *National Dairy Products Corp., supra*, however, is erroneous. It is apparent from the court's language that the court gave little weight to the patent attorney's testimony because he was not skilled in the art, not because he was a patent lawyer. This position is also supported by other circuits. In *Universal Athletic Sales Co. v. American Gym, Recreational and Athletic Equipment Corporation, Inc.*, 546 F.2d 530 (3rd Cir. 1976), the court indicates that the trial court must determine the weight to be accorded a person's testimony based on the witnesses skill, knowledge and experience in the field. There, the court concluded that the witness' qualification as an expert was lacking and accordingly, afforded his testimony little weight. *Id.* at 537–38.

The essential issues at this point then are whether Mr. Westman is sufficiently skilled or knowledgeable in the art to testify and what weight should be afforded his testimony.

The witness' curriculm vitae indicates that he is a graduate of North Dakota State University and that he has a bachelor of science degree in agriculture engineering as well as a law degree from William Mitchell College of Law. It also reveals that the witness was involved in the design and testing of agriculture equipment for about six years during the 1950's. By 1960, however, the witness apparently became a full time patent lawyer.

At trial, the defendant conducted a voir dire of the witness which indicated that he did not have any clients in the metal cutting field and that he did not consider himself skilled in the metal cutting art. He did qualify that statement, however, stating he considered himself "to have a working knowledge of some of the elementary features of metal cutting art." (Tr. 283)

After voir dire, the Court declined to limit the witness' testimony and he testified on a wide range of matters including the defendant's method of production and other matters. At one point during his testimony regarding patent '782, and the defendant's process, the defendant renewed their objection and the Court, in overruling the objection, indicated that it found, through his testimony, that Attorney Westman had demonstrated enough skill to interpret the meaning of the plaintiff's claim. (Tr. 663)

In essence, this represented the Court's determination that Mr. Westman was sufficiently versed in the art to assist the Court as a trier of fact in the understanding of the facts of the case. Upon review, the Court finds nothing that would change its view of Mr. Westman's testimony at this point. Although the Court has concluded that Mr. Westman is a competent to testify in this matter, the Court recognizes and will consider in weighing his testimony that his skill and knowledge is not equal to others who have testified including Messrs. Mooney, Bollinger, Shine and Alexander.

Having considered all of the evidence regarding the forging and Claim 1 of patent '782, the Court finds that the defendant's process is not encompassed within that portion of Claim 1 of patent '782 regarding the forming of a work piece "by machining metal stock to outline shape." (PX 29). The forging used by the defendant is already in outline shape prior to any machining. In addition, the amount and type of machining done by the defendant does not constitute machining to outline shape. Rather, the Court finds that the machining is merely a finishing type process; the forging gives the metal definite shape and form, and is thus substantially different from the step set out in Claim 1 of '782. Limiting its determination to the language of the claim, the Court finds that plaintiff's claim is indeed restricted to machining metal stock to outline shape and that defendant's forging process does not infringe on this patent step. In addition to finding that there is no infringement on the basis of the defendant's use of a forging, the Court also concludes that defendant's method of cutting the clutch teeth does not infringe on Claim 1 of the patent.

## METHOD OF CUTTING RATCHET CLUTCH TEETH

Steps two and three of Claim 1 of '782 set out the manner in which the patent provides for the cutting of the ratchet clutch teeth. Comparing this method with the one used by the defendant, the first thing that is obvious is that the steps used by the defendant are the inverse of the one in the patent. The reverse order, however, does not effect the Court's finding of noninfringement. The central issue and one which was extensively covered by Messrs. Westman, Bollinger and Shine in their testimony at trial is whether the cutting tools move in different directions.

Claim 1 does not state the direction in which the work piece moves relative to the cutting tool in step two and three. It is clear, however, on the basis of the testimony, that in step two, the work piece moves circumferentially and in step three it moves radially. (Tr. 913–915).

Plaintiff contends that the defendant's cutting tools also move in different directions and, therefore, the defendant's process infringes on the patent. Attorney Westman testified that he observed the ACAR machine and that in his opinion, the tool used for cutting the engaging faces and ramps of defendant's gears moved in different directions at stations two and three of defendant's process. Mr. Westman testified that at station two, where the engaging faces are cut, the "side cutting mill moved in a vertical downward direction for the initial cut and then back up for the retracting cut." (Tr. 673–74) He also testified that in milling the ramps at station three the cutting tool moved in a generally radial direction outward from the center of the work piece and that the tool moved along a path of approximately 16 degrees 30 minutes from the horizontal line of the work piece. (Tr. 671–78) See exhibit 67. One can best picture the relative position and movement at the two stations as the hands of a clock at 4:00 o'clock.

Mr. Westman testified the two cuts are indeed radial but that each circular object has an infinite number of radial directions. (Tr. 678) Mr. Westman analogized to the use of navigational aid which transmits signals radially in many different directions.

Defendant contends that both cuts are made in one direction in a radial direction.

Dr. Bollinger testified that defendant's tools in stations two and three moved in the same radial direction. In addition, he testified that in the milling art there are three basic directions: (1) axial-movement along an axis; (2) circumferential-movement along an axis; and (3) radial-movement out from the center of an object. Furthermore, according to Doctor Bollinger, all directions in the milling art are related to the work piece. (Tr. 913).

Mr. Shine, who is also skilled in the milling art, testified that the defendant's tools moved in the same radial direction. (Tr. 828–831) In addition, Mr. Mooney stated in his deposition that it was possible to move a cutter in the same radial direction and create the sloping ramps and engaging faces. (DX 240 at 201–202).

Defendant further contends that if one accepted Mr. Westman's concept of direction the terms used in the patent would have no significance because of the infinite number of directions in Mr. Westman's theory. Defendant also faults Mr. Westman's failure to relate his directions to the work piece as done in the milling art.

On the basis of the testimony of Doctor Bollinger and Mr. Shine, the Court finds that the defendant's method of producing gears does not infringe on Claim 1 of '792. The cutting tools in the defendant's method move in only one direction radially and the work piece in the patent moves in two different directions—circumferentially and radially. Therefore, there is no infringement of Claim 1 of '782.

Having disposed of plaintiff's claim of infringement of Claim 1 of '782, the Court need not reach the other defenses and allegations raised by the defendant. The Court now turns to the issue of the infringement of Claim 4 of patent '280.

Although the Court has held that the method of producing defendant's gears does not infringe on the plaintiff's patent, there is little doubt that the defendant's gear would infringe on the patent if the patent is valid.

The defendant has alleged that patent '280 is invalid because it fails to comport with the requirements of 35 U.S.C. § 112 and because it is obvious under 35 U.S.C. § 103.

■ Under the patent laws of the United States, a patent issued by the Patent Office carries with it a presumption of validity and that presumption applies independently to all claims of a patent. 35 U.S.C. § 282 (1976). Procedurally, the statute effectuated the presumption by placing the burden of establishing invalidity by clear and convincing evidence on the party asserting invalidity as a defense. *Chicago Rawhide Manufacturing Co. v. Crane Packing Co.*, 523 F.2d 452, 458 (7th Cir. 1975). That the Patent Office has considered and cited all the relevant prior art is also a major reason for the presumption. But, when it is demonstrated that the Patent Office has not considered all the relevant prior art, the presumption of validity is significantly dissipated. *Id.*

In the instant case, the plaintiff throughout its post trial brief continually asserts the presumption of validity as a reason for upholding this patent. In addition, plaintiff contends that the presumption should be given even greater effect in this case because the patent has undergone the reissuance procedure established by the Patent Office.

### Reissuance Procedure

■ Under 37 CFR §§ 1.171–79, a patentee may make a reissue application to the Patent Office for the purpose of having the Patent Office consider additional prior art which was not considered in the original application. 37 CFR § 1.175(a)(4). The purpose of this amendment to 37 CFR § 1.175 was to "improve the quality and

reliability of issued patents by strengthening patent examination and appeals procedures." (PX 123). The process also allows the Patent Office to consider opposition statements filed against the patent in its process of re-examination. This provides some measure of an advisorial system not found in the normal process. (Tr. 1123) If, however, the Patent Office determines that a patent is not defective or invalid in any way, it must reject the reissue application. The statutory authority for the reissuance procedure only permits reissuance of a patent if there is a defect which the reissuance procedure corrects. Thus, there is no authority for reissuing patents which are not defective. See 35 U.S.C. § 251. Although no change is permitted on a proper patent, the record of prosecution is intended to demonstrate the prior art which was examined in the reissuance process.

Under this procedure, after a reissue application is filed, a notice of its filing is published in the Official Gazette of the United States Patent and Trade Mark Office. Following that publication, there is a two-month period in which the Patent Office does not act upon the application. The intent of this hiatus is to enable the public to respond to the application. See 37 CFR §§ 1.11, 1.176 (1979). In addition, pursuant to the normal procedure of the Patent Office, no interviews regarding patentability are to be held until after the first official action of the office. See Patent Office Rule 133.

In the instant case, plaintiff was one of the first patent holders to file a reissue application. The amendments were effective on March 1, 1977 and plaintiff filed his reissue application on March 16, 1977. Apparently, plaintiff filed his reissue application to strengthen his position in this litigation. As part of the application, plaintiff identified as prior art all of the prior art that defendant listed in its response to plaintiff's interrogatories. The Patent Office examiner was also informed of the pending litigation.

In the application, plaintiff identified 56 separate items of prior art which it requested the examiner to examine in reference to its reapplication. (PX 43). The record of prosecution indicates that the examiner cited all of the referenced patents as pertinent prior art. (PX 43 p. 77–81). With respect to those patents referenced and cited by the Patent Office, it is clear that the presumption of validity exists. Defendant, therefore, must demonstrate by clear and convincing evidence that those prior art patents render the patent in issue obvious. *Chicago Rawhide Manufacturing Co. v. Crane Packing Co., supra.*

Defendant attacked the reissue application procedure in the instant case and asserts that, because of numerous irregularities, no added presumption of validity should attend the patent. Plaintiff, however, asserts that any irregularities which may have occurred were insignificant and that the presumption of validity should be enhanced. In support of his position, plaintiff cites *Corometrics Medical Systems, Inc. v. Berkeley Bio-Engineering, Inc.,* 193 U.S. P.Q. 467 (N.D.Cal.1977), in which the court held that the presumption of validity is strengthened when the Patent Office has considered all the prior art cited by the defendant as well as all the arguments raised by the defendant in the case. *Id.* at 474. Furthermore, plaintiff notes that at least one other federal judge has indicated that he gives a presumption of validity greater weight when the alleged infringer's prior art was reviewed by an examiner. F. Lacey, *A Federal District Court Judge's View on Patent Reissue, Protest and Duty of Disclosure,* 60 *Journal of the Patent Office Society* 529, 532 (1978).

Defendant, as stated earlier, has raised a number of alleged irregularities in the reissue application procedure. Defendant contends: that plaintiff's attorney improperly interviewed the patent examiner to discuss patentability prior to the first official action; that the reissue application was initially approved instead of being rejected; and, that opposition statements filed in the matter were not considered. Defendant also criticizes the examiner for failing to give any detailed analysis of his findings.

**554**

Because of these alleged failings defendant contends that there should be no strengthening of the presumption of validity as argued by counsel.

■ To determine whether the presumption of validity should be strengthened, the Court need not reach the validity of defendant's arguments because, from its understanding of the law in the seventh circuit, the statutory presumption can never be enhanced. The factors raised by the plaintiff and defendant alike are relevant only in the determination of whether the presumption as set by statute is dissipated to any extent. Considering the evidence as a whole, it suffices to say that there were indeed some irregularities in the reissuance process. It is clear, for instance, that the application should have been rejected and not accepted. It is also clear that there was an error in failing to acknowledge and record the opposition statements filed. (Tr. 1125–27). These apparent slip ups are perhaps best attributed to the novelty of the procedure more than anything else.

Defendant's other allegations that Mr. Low's four interviews with the examiner prior to the first office action were improper and that the opposition statements were not considered are more serious. Both allegations raise the spector that the process was no more adversarial than a normal application process. The parties spent considerable time at trial detailing their arguments and presenting evidence on both of these issues. The Court has considered the evidence carefully and finds as to the opposition statements of Mr. Starke and Mr. Clemency (PX 48, 50) the defendant has failed to prove that the opposition statements were not before the examiner sometime during the re-issuance process. Although their absence from the file wrapper is unexplained, Mr. Low testified he saw the documents on the examiner's desk during one of his interviews. Even though the Court has found that the opposition statements were in the possession of the examiner at some time, there is no evidence that they were considered by the examiner and, therefore, the Court must conclude that they were not considered or alternatively they were not considered relevant by the examiner.

As to the interviews with the examiner, the Court finds that this was a reissue application and not a continuing or substitute application as argued by the plaintiff. Therefore, under the Patent Office Rules of Procedure, the interviews by Mr. Low prior to the first office action were improper if they were to discuss patentability. Although most of the discussions prior to the first office action were only to comply with the rule of full disclosure, some of the material discussed did involve the issue of patentability.

The effect of this defect as well as the other raised by the defendant is to diminish any presumption of validity that would attach in the consideration of the prior art revealed under the reissuance procedure. To the extent that the process enabled the examiner to consider previously unconsidered prior art, the reissuance application served its purposes and the Court will give the examiner's decision its proper weight as to those items the examiner considered and cited in his report. The Court notes, however, that the examiner's decision would be given much greater weight if he had set forth his reason in denying the reissue application. *See* F. Lacey, *A Federal District Court Judge's View on Patent Reissue, Protest and Duty of Disclosure, supra.*

As stated earlier, the examiner listed all the referenced patents as relevant prior art but other than the submission by the plaintiff's attorney, there is no reference to the other material identified by the plaintiff. Two pieces of prior art not cited or listed by the examiner which the Court considers relevant are Kiekhaefer Corp. drawing No. 43–31886 and Gale Products drawing 302486. At trial, Mr. Low, plaintiff's representative before the Patent Office, testified that he provided the information contained in the letter of October 18, 1977 (PX 43) and that it contained all the information he had. (Tr. 611). In addition, he stated that it was ordinary practice for the examiner to list the most pertinent art references in the

office action (Tr. 597–98) and that there was no listing by the examiner of these items.

Mr. Brenner, a former commissioner of patents from 1964–1969, also testified as to the normal procedure used by the Patent Office. Mr. Brenner stated that normally an examiner would "list the prior art he thought was most pertinent in his mind." (Tr. 1136)

A review of the file wrapper confirms that the examiner did not list either drawing in his list of prior art. Considering the extensive list of patents cited by the examiner, the only reasonable inference that can be drawn from the examiner's failure to cite the Kiekhaefer and Gale drawing is that he did not consider these as relevant prior art. Because of the examiner's failure to consider and reference these items of prior art, the presumption of validity is dissipated as against them. *See Chicago Rawhide Manufacturing Co., supra.*

In determining the validity of the patent, the Court should first consider the question of obviousness under 35 U.S.C. § 103.

### OBVIOUSNESS

In defense of the infringement claim, defendant asserts that patent '280 is invalid under 35 U.S.C. § 103 (1976). Section 103 provides:

Conditions for patentability; non-obvious subject matter. A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

In *Graham v. John Deere Company*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court set forth the standard to be utilized in determining obviousness under § 103. The Court held:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. 383 U.S. at 17–18, 86 S.Ct. at 694.

In following the dictates of *Graham* this Court shall consider the elements set forth above based on the evidence presented at trial. *See Republic Industries, Inc. v. Schlage Lock Company*, 592 F.2d 963 (7th Cir. 1979); *Gass v. Montgomery Ward & Co.*, 387 F.2d 129 (7th Cir. 1967).

### SCOPE AND CONTENT OF THE PRIOR ART

In determining the question of obviousness, the Court is bound to consider all the prior art. *See New York Scaffolding Company v. Liebel-Binney Construction Company*, 254 U.S. 24, 41 S.Ct. 18, 65 L.Ed. 112 (1920). Prior art includes the knowledge, acts, descriptions and patents set forth under 35 U.S.C. § 102.

In the original application and prosecution, the Patent Office referenced only one piece of prior art, Kauffman 288. In the reissue application procedure, however, the plaintiff cited as earlier indicated 56 different items of prior art (PX 43, p. 2). The examiner in rejecting the reissue application referenced as the most pertinent prior art all of the prior art patents cited by the plaintiff. (PX 43 p. 77–81). The examiner did not reference, however, the Gale Product drawing No. 302486 or Kiekhaefer Corp. drawing 43–31886 or the American Mechanical Dictionary. Each of these were submitted to the examiner in the reissue application.

Defendant pursuant to 35 U.S.C. § 282 referenced 17 prior art patents upon which it would rely on at trial. In addition, it referenced the two piece gear and ratchet clutch made by Capitol Gears in accordance with Keikhaefer drawing 43–31886 and sold to defendant as well as two piece gears sold to Scott Atwater and West Bend.

Of the patents referenced by defendant, all but two were considered by the Patent Office in the reissuance process. The two not considered were Wildhaber 2,388,456 and Wildhaber 2,398,570. Wildhaber '456 teaches a tooth faced clutch member with teeth extending in a radial direction and whose sides are convex profile shape and convex lengthwise shape. Wildhaber '570 teaches a tooth face clutch with teeth curved longitudinally across its face which taper in depth from their outer to their inner end and which have helicoridal side tooth surfaces (DX 238, items 12, 13). Although Wildhaber '456 was mentioned in the opposition statements, '570 was not. In the Court's opinion, however, neither of these are significant pieces of prior art.

Although referencing numerous pieces of prior art, before trial, the defendant contends that Kaufman '288, Kiekhaefer drawing No. 43–31886 (PX 27) and Gale drawing No. 302,486 (DX 212) are the most relevant prior art.

The Kiekhaefer drawing 43–31886 teaches a two piece bevel gear and ratchet clutch. There is an unobstructed annular ring of a plurality of beveled gear teeth surrounding the hub. On the hub there is a ring of arcuate sloping ratchet teeth. The engaging faces of the ratchet teeth extend generally along radial planes and are inclined inwardly from the ridge of each tooth by up to 8 degrees. These ratchet teeth are recessed relative to the beveled gear and concentric with and within the inter-periphery of the ring of gear teeth. The hub and bevel gear are brazed together. It is undisputed that prior to January 14, 1962, Capitol Gears made gears for the defendant in accordance with this diagram and that this drawing was used by the plaintiff's patent draftsman in preparing the patent application. (uncontested facts ¶¶ 18, 19, 22).

The Gale Product drawing 302486 (DX 212) teaches a one piece bevel gear with two recessed clutch teeth. There is an annular ring of a plurality of beveled gear which surround the two recessed clutch teeth. The clutch teeth are machined by using a side mill cutter to remove the metal surrounding each tooth. The two clutch teeth are opposite one another and are squared with no sloping backs. (Tr. 754–57). The engaging faces appear to be somewhat concaved. In addition, according to Mr. Mooney, the engaging faces are formed not generated because they take the shape of the endmill. This gear was manufactured for use in Outboard Marine Corp. (OMC) outboard motors and was used for the same purpose as the patent in issue. It was also known to those skilled in the art at the time of the invention.

The Kaufman patent '288 (PX 110), which was cited originally by the Patent Office, discloses a reverse bevel gear with a clutch for use in a washing machine. Figure 3 of the diagram accompanying the patent illustrates an outer ring of beveled gear teeth and an inner ring of recessed clutch teeth. The clutch teeth have sloping ramps and engaging faces which lie in a radial plane. There is no indication in the patent specification or claim whether the patent is a one piece gear or whether it is a two piece gear.

During the reissue prosecution, plaintiff contacted the owners of the Kaufman patent and they indicated that although the principal parties acquainted with the invention were not available, the assignee stated that the gear would have been made in two piece construction similar with the method employed by the plaintiff prior to 1962. (PX 43, 56–59).

Defendant contends that it is immaterial that the Kaufman '288 patent would have been made in two pieces because the diagram illustrates a one piece gear either by design or accident. Even if accidental, defendant asserts it is valid prior art. In support of its position, defendant cites *Application of Meng*, 492 F.2d 843 (Cust. &

Pat.App.1974). In *Meng*, although the court recognized that a patent may be "[interpreted] or rendered obvious by a drawing in a reference, whether the drawing disclosure be accidental or intentional," it held that the disclosure did not teach or suggest the claimed invention to those who had never seen the applicants' disclosure. *Id.* at 847. In *Meng*, the portion of a diagram alleged to teach or suggest the applicant's disclosure appeared in a reference unrelated to the problem solved by the applicant's disclosure. *Id.* at 848.

An accidental disclosure from a drawing that teaches or suggests a claimed disclosure is available as prior art if the disclosure is "clearly made in a drawing." *Application of Seid*, 161 F.2d 229, 231, 34 CCPA 1039 (1947); *Bourns, Inc. v. Dale Electronics, Inc.*, 308 F.Supp. 501, 516–17 (D.Neb.1969). That one does not realize what he has disclosed is also immaterial. *DeForest Radio Co. v. General Electric Co.*, 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339 (1931).

Plaintiff here suggests that as in *Meng*, figures three and four of the diagram accompanying Kaufman '288 do not teach or suggest the claims of the patent in issue. *Meng*, however, is distinguishable on its facts because the reference was unrelated to the problem solved by the applicant's disclosure and the reference was not clearly disclosed. In this case, the gear disclosed is related to the problem solved by plaintiff's patent because it was designed to facilitate disengagement of the driving mechanism in a wringer roller. The specifications indicate that the inventor was concerned about friction with the clutch teeth and that was one of the reasons for the sloping clutch teeth. Furthermore, the figures in Kaufman '288 more clearly reveal the disclosure than the figure relied on in *Meng, supra.*

On the basis of the foregoing, the Court finds that Kaufman '288 discloses a one piece gear and recessed clutch with sloping ratchet teeth and radial engaging faces. That the gear may have been manufactured in two pieces is not relevant to the inquiry because the diagram clearly discloses a one piece gear.

Defendant has also cited nine other prior art patents it contends are relevant to the patent. The patents include Schroeder, 1,288,694; Cumerford 1,319,926; Reid 1,441,528; Nelson 1,753,528; Lenz 2,180,154; Kiekhaefer 2,549,484; Kiekhaefer 2,630,775 and Conover 2,672,115. A review of these patents reveals that they all are concerned with some sort of driving mechanism for either a washing machine, tractor or outboard motor. Each of the diagrams accompanying the above patents also shows what defendant contends are a recessed clutch teeth surrounded by beveled gears. Only two patents, Schroeder '694 and Cumerford '926 mention the construction of the gear in the specifications. The language of these patents suggest a one piece gear (PX 238 item 6 lines 70–72 and item 7 lines 100–110). The other patents only show what defendant contends to be one piece gears. Defendant relies on the testimony of Doctor Bollinger that if the gears shown were in fact two piece gears the diagrams would have been drawn to show that. On the basis of Doctor Bollinger's testimony and applying the accidental disclosure rule, defendant asserts that all of these patent diagrams are relevant prior art.

Plaintiff at trial attempted to show that there was some doubt as to the construction of these gears; that some of the patents were silent as to the gear construction; that the Kiekhaefer patents were probably produced in two pieces; and, that the diagrams also did not reveal the shape of the clutch teeth.

While the Schroeder '694 and Cumerford '926 do indicate one piece construction and are relevant, the Court is not persuaded that the others are relevant even under the accidental disclosure rule. The diagrams are not as clear as those in Kaufman '288 nor do the patents in question really concern the problem which the patent in issue addressed. *See Application of Meng*, 492 F.2d 843; *Application of Seid*, 161 F.2d at 231.

In summary, the Court finds that the most relevant pieces of prior art are the

Kiekhaefer drawing 4331886 (PX 27); the Gale Products drawing 302486 (PX 212) and the Kaufman patent '288. In addition, Schroeder '694 and Cumerford '926 (DX 238 items 6 and 7) are relevant to the extent they disclose a one piece bevel gear with recessed clutch teeth of unknown design.

## DIFFERENCE BETWEEN THE PRIOR ART AND PATENT IN SUIT

### 1. Kiekhaefer Drawing 43-31886

The major difference between Claim 4 of Mooney '280 and Kiekhaefer drawing 886 is that Claim 4 is manufactured in one piece and Kiekhaefer drawing 886 is manufactured in two pieces and then brazed together. Other than that, they are very similar. They both have an annular ring of beveled gears with a recessed annular ring of ratchet clutch teeth concentric with and interior to the ring of beveled gears. Furthermore, the engaging faces of both gears lie in a generally radial plane, have sloping backs and have about 5 ° of positive rake.

### 2. Gale Product Drawing 302486

Gale drawing 986 which discloses a gear used by OMC in its outboard motors is similar to Claim 4 of Mooney '280 in that it was manufactured in one piece. The most significant difference, however, is the structure of the clutch teeth. In Gale drawing 480 the teeth are level at the top with no slope to their backs and no incline. The teeth in Mooney '288 have sloping backs and the engaging faces slightly inclined. That the Gale drawing 486 diagram shows only two teeth and Mooney '280 diagram shows six teeth is not significant because the patent in suit is not limited to six teeth. Mr. Alexander did, however, indicate that the one piece OMC gear would not be feasible with six teeth because of the clashing of teeth.

### 3. Kaufman '288

The Kaufman '288 diagram is similar to the patent in suit in that it has an annular ring of beveled gear teeth with a recessed annular ring of clutch teeth. The clutch teeth have sloping backs and the engaging faces lie in a generally radial plane. The most significant difference between the two is the inclination of the engaging faces. The faces in Kaufman '288 incline outwardly and the faces in Claim 4 of Mooney '280 incline inwardly.

## LEVEL OF SKILL IN THE ART

To determine the level of ordinary skill in the art at the time of the invention, the Court of necessity must look to those who are familiar with the art and ascertain what their subjective reaction is to the question of obviousness. *Malsbary Manufacturing Company v. Ald, Inc.*, 447 F.2d 809, 811 (7th Cir. 1971). At trial, both parties presented witnesses who were skilled in the art of gear design and metal cutting.

Mr. Mooney, the plaintiff, has been involved in the manufacture and design of gears for approximately 45 years. He has a bachelor degree in Mechanical Engineering from the University of Minnesota and has taught machinery in their engineering school. Sometime in the middle 1930's, after completing his education and doing some die making for a number of firms, Mr. Mooney went to work for his father at Auto Engine Works, the corporate predecessor to Capitol Gear, Inc., of which he is currently the president. Until approximately 1959, Mr. Mooney worked as a foreman and then supervisor of the machine shop. In addition, he was involved in designing and engineering. In that regard, he testified that many times he would take specifications and designs from clients and make the necessary alterations in standard milling machines to produce the gears. At the time the patented device was invented, Mr. Mooney was president of Capitol Gears which was making two piece gears from the Kiekhaefer drawing 43-31886. He also testified that he was aware of the one piece Gale Product or OMC bevel gear and clutch.

The following is the transcript of the questioning by defendant of the plaintiff wherein he stated his conclusion as to the obviousness of the making of a one piece gear:

Q Well now, if a two-piece unit, two-piece brazed unit failed, wouldn't the first thought be to make it in one piece?

A Well, looking back it sounded like they should have done that but they didn't.

Q I'm talking about you as a person who is skilled in the gear art?

A Yes.

Q If a two-piece unit failed, wouldn't the first thought to come to your mind be to make it in one piece, if you could?

A I wouldn't say it's the first thought I had in mind. I had a lot of ideas in my mind. I would say it was possible but there were problems in making it, and I had—

Q I'm not talking about the problems in making it. I'm talking about the first thought. If you were confronted with a two-piece brazed gear that failed due to the brazing, you as a person skilled in the gear art, wouldn't the first thought come to you to be to say can't we make this in one piece?

A Indeed it seemed to occur quicker than anybody else because that's what I did . . .

(Tr. 136–137).

Defendant contends that the plaintiff's testimony indicates he believed it was obvious in view of the prior art to make a one piece gear. Plaintiff argues that Mr. Mooney's response was not that it would be obvious in view of the prior art upon the failure of a two piece gear to make a one piece gear. Plaintiff interprets the testimony to mean that the idea to make a one piece gear came to him before anyone else. Interpreted either as a direct response or, as the plaintiff suggests, the response is of some evidentiary value because he was undisputedly skilled in the art.

Mr. Charles Alexander testified on behalf of the defendant at trial. Mr. Alexander earned a bachelor of science degree in Me-chanical and Marine Engineering from the University of Michigan in 1943. He holds approximately twenty patents in marine and recreational products. Mr. Alexander has been employed by the defendant since 1953, first as chief engineer (1953–1964), then vice president of engineering (1964–1976), and now as president of Mercury Marine and vice president of the parent corporation, Brunswick Corp. (Tr. 736). As chief engineer, Mr. Alexander was concerned with the design of lower units and propellers for outboard motors. He testified that he had over 25 years of experience in designing and developing the gear cases and gearing of the lower units of outboard motors. (Tr. 738). In addition, as chief engineer, he was involved in the design of the two piece gear used by Kiekhaefer and was familiar with the one piece gear used by OMC in the early 1950's. According to his testimony, the two piece construction grew out of the one piece because of a need to add more teeth and to slope the teeth to prevent breaking.

In response to defendant's question regarding the obviousness of making a one piece gear, Mr. Alexander testified that he believed it would be obvious to make a one piece gear "if your had a machine that could make them with teeth, six teeth you wanted." (Tr. 787–768).

Mr. Alexander's testimony indicates that he had doubts as to the method of making a one piece gear but that he had no doubt that it would be obvious to make it in one piece if there was a method to do so.

Mr. Richard Schwab also testified at trial for plaintiff. Mr. Schwab has a Bachelor of Science in Engineering from Northwestern University and worked for the defendant, and its predecessor from 1959 to 1970. Prior to that time, he worked as an application engineer for Rockwell Standard Corporation working on gears, axles, and various power trains. While working for the defendant, Mr. Schwab worked under Mr. Alexander and was responsible for testing the lower units and hardware for the outboard

motors and stern driven motors. Mr. Schwab testified that it would be obvious due to the failures of the brazed parts to try and make a one piece gear. He also testified, however, that he did not know whether it was possible to make such a gear. (Tr. 371).

Doctor John Bollinger, who was defendant's expert witness, is Professor of Mechanical Engineering and Chairman of the Mechanical Engineering Department of the University of Wisconsin-Madison. In addition to holding several patents himself, Doctor Bollinger has served as consultant to a number of companies that design and fabricate milling and drilling tools. He has also worked for Gealson Works of Rochester, New York in designing and building a gear cutting machine and has done extensive research in gear design. After having reviewed the defendant's prior art, including the two drawings and Kaufman '288, Dr. Bollinger concluded that it would be obvious to one of ordinary skill in the art in 1962 to try to make a one piece gear. (Tr. 880–81).

Having reviewed the qualifications and skill of those who testified at trial, the Court concludes the level of skill in the art of gear design was very high in 1962. Those of ordinary skill in the art would at least have a degree in Mechanical Engineering. In addition, it is clear that the art of gear design and the milling of gears are closely connected and those skilled in the art of gear design would also be skilled in the art of milling or metal cutting. Furthermore, one skilled in the art would also be expected to have a good deal of practical experience in the art and would probably hold a number of patents which originated from their work.

## OBVIOUSNESS

Having determined that the ordinary skill of art was high in 1962 and that one skilled in the art usually had a great deal of practical experience, as well as at least a bachelor degree in mechanical engineering, the Court must now project itself backward in time to determine whether the making of a one piece beveled gear and recessed ratchet clutch would be obvious based on the prior art to one skilled in the art. The prior art the Court has determined most relevant as stated before is Kiekhaefer drawing 43, Gale Products drawing, and Kaufman '288 to the extent they show a one piece gear, as well as make mention of it in the specification, the Schroeder '694 and Cumerford '926 patents are also relevant prior art.

At the outset of its determination, the Court must consider defendant's argument that the making of what was formerly two pieces into one piece is per se obvious. In support of its statement, defendant cites *Allegheny Steel and Brass Corp. v. Elting*, 141 F.2d 148 (7th Cir. 1944); *Enterprise Railway Equipment Co. v. Pullman Standard Car Mfg. Co.*, 95 F.2d 17 (7th Cir. 1938) and *In re Larson*, 340 F.2d 965, 52 CCPA 930 (1965).

In *Allegheny Steel and Brass Corp.*, the Court held that the casting of a nipple and arm of a lamp in one piece did not "rise to the dignity of invention" when the prior art disclosed a nipple not cast integral with the arm. 141 F.2d at 150.

In *Enterprise Railway Equipment Co. v. Pullman Standard Car Mfg. Co.*, 95 F.2d 17, the Court held that the making of a side wall of a railroad car with one piece of metal was not patentable over the prior art which disclosed a two piece firmly riveted side wall. The Court concluded:

> [O]rdinarily it is not invention to substitute a one-piece device for a two-piece device. It is only when some new result, not a mere difference in degree, is [thus] obtained. Where the prior art already suggests the idea of a device as to form and character of operation and result, mere improvements as to the material used and as to durability and effectiveness do not attain the dignity of invention. *Id.* at 21.

The only case cited by the defendant after the passage of the Patent Act of 1952 is

*In re Larson,* 340 F.2d 965. In *Larson,* the Court of Customs and Patent Appeals upheld the determination of the board denying a patent because "the use of a one-piece construction instead of the [construction] disclosed in Tuttle [a brake disc rigidly secured to a clamp] would be merely a matter of obvious engineering choice." *Id.* at 968.

Plaintiff, in his reissue application, cited numerous cases in which one piece construction or design was upheld as patentable over the prior art. In his post trial brief, he has also asserted that the patentability of a one piece item over the prior art which was in two pieces must be made on a case-by-case basis.

In *Krementz v. The S. Cottle Company,* 148 U.S. 556, 13 S.Ct. 719, 37 L.Ed. 558 (1893), the Supreme Court held a collar button with a one piece head and stem patentable over a multipiece collar button. The Court found the one piece button to be a noticeable improvement over the two piece button and therefore an invention. In *Howard v. Detroit Stove Works,* 150 U.S. 164, 170, 14 S.Ct. 68, 70, 37 L.Ed. 1039 (1843), the Court held that the casting of a stone grate in one piece, which was formerly cast in two pieces, did not rise to the level of an invention.

In *Stuber v. Central Brass and Stamping Co.,* 224 F. 712 (7th Cir. 1915), the court found that a one piece hose coupler was patentable over the prior art which disclosed a two piece hose coupler. In doing so, the Court noted a number of improvements of the one piece coupler over the prior art. *Id.* at 715–16.

The final case cited by plaintiff is *Deknatel, Inc. v. Bentley Sales, Inc.,* 173 U.S.P.Q. 129 (C.D.Cal.1971). In that case, the court held that a one piece underwater drainage apparatus was patentable over the prior two and three piece prior art. The court based its decision on the many improvements it found that resulted from the one piece structure.

A review of the above-cited cases makes it clear that there is no per se rule that making something in one piece that was formerly made in two or more pieces renders it obvious. Rather, the Court must look beyond the mere fact of unitary construction to determine what improvement results from the one piece construction and whether the improvement or construction itself was obvious from the prior art.

In this case, the major improvement of the patented device is the added strength and durability of the gear. There is no longer a possibility that the brazing will fail or the pins might shear. The one piece gear greatly reduced the possibility of failures. Unlike the majority of cases cited by both the plaintiff and defendant, the prior art in this case does reveal one piece gears with recessed clutches. The Kaufman '288 and the Gale Product drawing both illustrate a one piece bevel gear and clutch. Similarly, the Schroeder '644 and Cumerford '926 both reveal one piece gears and clutches. The Gale Product drawing also discloses a method of cutting the gear with a side forward mill cutter and not using the revolving disc or wheel type cutter. The shape of the teeth in the Gale Product drawing are not however exactly the same as the ones in the patent. The teeth shown in Kaufman '288 are similar to those in the patent that have sloping backs and radial engaging faces.

On the basis of these pieces of prior art, Dr. Bollinger and Mr. Alexander each testified that it would be obvious to make one piece gears. The Court finds that it would be obvious under 35 U.S.C. § 103 to make a one piece gear with a ratchet clutch teeth. The prior art shows one piece gears and two piece gears which were almost identical to the patented gear. It is clear that the plaintiff did have great success in selling the gear, but it was the method of producing the gear and not the gear which was in fact unobvious. The Kiekhaefer drawing has as stated before all the major elements of Claim 4 in it and it was used in the patent diagram. Although this drawing and the Gale Product drawing were

both presented to the Patent Office, there is, as stated earlier, no indication that they were considered by the examiner in reaching his decision. Therefore, the Court does not find that the presumption of validity which might ordinarily attach to the patent to be applicable with respect to these line drawings by the fact that the only real improvement over the two piece gear is the one piece gear is the added strength and durability. In that respect this case is similar to that of *Enterprise Railway Equipment Co. v. Pullman Standard Car Mfg. Co., supra.*

In summary, the Court finds that Claim 1 of United States Patent No. 3,248,782 is not infringed by the defendant's method of producing one piece beveled gears and recess ratchet clutches and that United States Patent No. 3,245,280 is obvious under 35 U.S.C. § 103 and therefore invalid.

SO ORDERED.

## APPENDIX I

United States Patent Office

Patented Apr. 12, 1966

3,245,280

INTEGRAL GEAR

George M. Mooney, St. Paul, Minn., assignor to Capitol Gears Inc., St. Paul, Minn., a corporation of Minnesota

Original application Jan. 14, 1963, Ser. No. 251,168. Divided and this application Feb. 3, 1965, Ser. No. 435,114

4 Claims. (Cl. 74—462)

This is a division of application Serial No. 251,168, filed January 14, 1963.

This invention relates to an integral composite polyfunctional toothed working part, such as a gear. More particularly, this invention relates to an integral composite polyfunctional working part, such as a gear, having at least two separate operating concentric toothed annular faces, which are separate and spaced apart or offset with respect to one another. For convenience, the invention is described and illustrated

with specific reference to a combination bevel gear and clutch of a type useful in reverse gear mechanisms.

The invention is illustrated with reference to the drawings in which like numerals refer to corresponding parts and in which:

FIGURE 1 is a plan view of an integral bevel gear and clutch according to the present invention;

FIGURE 2 is a section on the line 2—2 of FIGURE 1 and in the direction of the arrows;

FIGURE 3 is a plan view of the working face of an integral bevel gear and clutch showing diagrammatically the manner in which the ratchet teeth of the clutch plate are formed;

FIGURE 4 is a section on the line 4—4 of FIGURE 3 and in the direction of the arrows; and

FIGURE 5 is a partial plan view on an enlarged scale of a portion of the working face of the clutch to show details.

Referring to the drawings, the one-piece integral composite gear and clutch, indicated generally at 10, includes a hub 11 by means of which the integral structure is mounted in bearings or fitted to the end of a shaft. Radial holes 12 in the hub are provided to hold the work piece in a jig during cutting of the teeth. The end of the jig shaft may bottom on an annular shoulder 14. The face of the integral gear and clutch is provided with an annular ring of a plurality of radiating beveled gear teeth 15 by milling in the conventional manner.

The clutch portion of the integral composite structure includes a plurality of tapered arcuate ratchet teeth 17 disposed in an annular array concentric with and within the inner periphery of the bevel gear and recessed or spaced from the plane generated by the top-most surfaces of the bevel gear teeth. This is clearly apparent in FIGURE 2. The plane of the highest surfaces of the bevel gear teeth is there indicated by the broken line designated by numeral 18.

Each ratchet tooth face of the clutch is in the form of an arcuate sloping surface extending from a peak or crown or ridge 19 to a valley or channel 20. The engaging face 21 of each ratchet tooth lies generally along a radial plane extending through the longitudinal center line or axis of rotation of the composite unit. However, as more clearly seen in FIGURE 5, the engaging face 21 is preferably provided with a slight convexity to form a small crown. The outer peripheral edge of each ratchet tooth abuts against and is integral with the inner periphery of the bevel gear. This contributes to the added strength of the composite unit.

Combination gears and clutches of the type described have been known hereinfore. However, because of fabrication problems these prior units have always been made as separate parts and then secured together in some convenient manner. For example, the ratchet and bevel gear were separately formed, and then brazed together; or the ratchet was first formed and a bevel gear blank was then brazed to it, and, thereafter, the gear teeth were generated. In such two piece construction the bevel gear and ratchet were brazed generally along the broken line indicated at 22 in FIGURE 2, the bevel gear being supported on shoulder 23 of the ratchet.

The reason why this means of fabrication was necessary is that it was not possible to cut the ratchet teeth by existing tooth cutting means because of the offset recessed or depressed relationship between the ratchet teeth of the clutch and the teeth of the bevel gear. In other words, the area of the work blank in which the ratchet teeth were to be formed was inaccessible by ordinary tooth cutting means utilizing revolving disc or wheel type cutters. By forming the parts separately no such problem existed. The ratchet teeth of the clutch, when separated from the bevel gear, were formed in the conventional manner by conventional tooth cutting means.

For many years the two part brazed structures were satisfactory in service. However, with increasing horsepower the composite gears and clutches are subjected to greater forces, with the result that shearing occurred at the site of the braze

between the gear and clutch. Previous attempts to strengthen the composite gear and clutch structure have not been successful.

Thereupon, the integral composite gear and clutch according to the present invention was conceived but such structure was impossible of manufacture by existing tooth cutting means because of the inaccessibility of the work piece by the cutting tool in the area of the ratchet teeth. Accordingly, the method as illustrated in FIGURES 3 and 4 was conceived as a means of overcoming the seemingly insurmountable fabrication problem.

According to that method, the work piece is machined to outline shape from steel bar stock of appropriate quality and strength. The resulting work piece is held in a suitable jig at an angle with respect to a cutting tool 25 corresponding to the desired slope of the face surface of the ratchet teeth. The end cutting face of the tool 25 is brought into contact with the work piece and cuts the ratchet tooth surface by a combination of the relative rotational movement of the cutter about its own axis and rotational movement of the work piece about its own axis through an arc dependent upon the desired number of ratchet teeth.

The channel or valley 20 between adjacent ratchet teeth and the engaging face 21 of each ratchet tooth is formed by another side milling cutter 27 having cutting faces at its edges. Cutter 27 is positioned relative to the work piece so that the axis of rotation of that cutter varies from generally parallel to the axis of rotation of the finished integral gear and clutch to about 8° or so away from the axis of rotation of the finished part. Cutter 27 and the work piece move relative to one another along a path lying generally along a radius of the work piece. However, as shown in FIGURE 4, cutter 27 and the work piece preferably move relative to one another along a very slightly arcuate path to produce the desired crown on the engaging face 21. Each cutting operation is repeated to complete the required number of ratchet teeth.

The edge between ratchet tooth ridge 19 and engaging face 21 is preferably chamfered. Because the bevel gear teeth 15 are out in an exposed accessible portion of the work piece, the bevel gear teeth are produced by conventional tooth cutting means in the conventional manner. The bevel gear teeth may be generated before or after the ratchet teeth, but preferably afterward.

In FIGURE 5 there is shown on an enlarged scale the portion of the plan view of FIGURE 3 included within broken line circle 28 in order to show more precisely the preferred construction of the ratchet tooth engaging faces 21. In order to concentrate the load of the force exerted upon the clutch teeth by an engaging clutch dog in the center of the teeth it is desirable that the engaging faces of the teeth be provided with a slight convex crown. In order to produce such a crown according to the specifications of the designer of the mechanism in which the gear and clutch is used, cutter 27 is moved relative to the work piece along an arcuate path of large radius. This produces the very slight convex curvature of the engaging face 21 as shown in the enlarged detail view of FIGURE 5. As an example of design specifications in this regard, one requirement is that the surface of the engaging face 21 of the ratchet tooth have a crown of 0.002 inch in a $5/16$ inch length and that the crown be centered in the shaded zone 29. Obviously the height of the crown can be varied to meet specific requirements. Similarly, the degree of inclination of the engaging faces of the ratchet teeth from the radial plane extending through the longitudinal center line of the integral gear and clutch may be varied to meet design specifications. In the example given, the engaging face 21 is inclined 5 ° inwardly from the edge with ridge 19.

Although the invention is described and illustrated by specific reference to a combined bevel gear and clutch, it will be apparent that the principles are applicable to any composite integral toothed structure in which the toothed engaging faces are offset or displaced with respect to one another such that one set of teeth are in a location

which is inaccessible by conventional tooth cutting means. The invention is obviously not limited to any particular size or shape or arrangement of gear teeth, or for a working part for the purpose of performing any specific function or a working part for use in any particular mechanism.

It is apparent that many modifications and variations of this invention as hereinbefore set forth may be made without departing from the spirit and scope thereof. The specific embodiments described are given by way of example only and the invention is limited only by the terms of the appended claims.

I claim:

1. As a new article of manufacture, a one piece integral composite gear and clutch adapted for rotation about an axis, said gear and clutch including an unobstructed annular ring of a plurality of gear teeth disposed about said axis of rotation and an annular ring of a plurality of arcuate sloping ratchet teeth concentric with and within the inner periphery of said ring of gear teeth, said ratchet teeth being recessed relative to said gear teeth, each of said ratchet teeth having a generally radial engaging face extending generally along a line passing through said axis of rotation, the engaging face of each of said ratchet teeth being slightly arcuate to provide a low convex crown in the approximate center of each engaging face.

2. An article of manufacture according to claim 1 further characterized in that said gear is a bevel gear.

3. An article of manufacture according to claim 1 further characterized in that the engaging face of each of said ratchet teeth is inclined inwardly from the ridge of each of said teeth by up to about 8 °.

4. As a new article of manufacture, a one piece integral composite gear and clutch adapted for rotation about an axis, said gear and clutch including an unobstructed annular ring of a plurality of gear teeth disposed about said axis of rotation and an annular ring of a plurality of arcuate sloping ratchet teeth concentric with and within the inner periphery of said ring

of gear teeth, said ratchet teeth being recessed relative to said gear teeth, each of said ratchet teeth having a generally radial engaging face extending generally along a line passing through said axis of rotation, the engaging face of each of said ratchet teeth being inclined inwardly from the ridge of each of said teeth by up to about 8°

**References Cited by the Examiner**

UNITED STATES PATENTS

2,289,288  7/1942  Kauffman _____ 74—378

DON A. WAITE, *Primary Examiner.*

APPENDIX II

**United States Patent Office**

**Patented May 3, 1966**

3,248,782

**METHOD OF MAKING A ONE PIECE INTEGRAL/COMPOSITE GEAR**

George M. Mooney, St. Paul, Minn., assignor to Capitol Gears Inc., St. Paul, Minn., a corporation of Minnesota

Filed Jan. 14, 1963, Ser. No. 251,168

2 Claims.  (Cl. 29—159.2)

This invention relates to an integral/composite polyfunctional toothed working part, such as a gear, and the method of making the same. More particularly, this invention relates to an integral composite polyfunctional working part, such as a gear, having at least two separate operating concentric toothed annular faces, which are separate and spaced apart or offset with respect to one another. For convenience, the invention is described and illustrated with specific reference to a combination bevel gear and clutch of a type useful in reverse gear mechanisms.

The invention is illustrated with reference to the drawings in which like numerals refer to corresponding parts and in which:

FIGURE 1 is a plan view of an integral bevel gear and clutch according to the present invention;

FIGURE 2 is a section on the line 2—2 of FIGURE 1 and in the direction of the arrows;

FIGURE 3 is a plan view of the working face of an integral bevel gear and clutch

showing diagrammatically the manner in which the ratchet teeth of the clutch plate are formed;

FIGURE 4 is a section on the line 4—4 of FIGURE 3 and in the direction of the arrows; and

FIGURE 5 is a partial plan view on an enlarged scale of a portion of the working face of the clutch to show details.

Referring to the drawings, the one-piece integral composite gear and clutch, indicated generally at 10, includes a hub 11 by means of which the integral structure is mounted in bearings or fitted to the end of a shaft. Radial holes 12 in the hub are provided to hold the work piece in a jig during cutting of the teeth. The end of the jig shaft may bottom on an annular shoulder 14. The face of the integral gear and clutch is provided with an annular ring of a plurality of radiating beveled gear teeth 15 by milling in the conventional manner.

The clutch portion of the integral composite structure includes a plurality of tapered arcuate ratchet teeth 17 disposed in an annular array concentric with and within the inner periphery of the bevel gear and recessed or spaced from the plane generated by the topmost surfaces of the bevel gear teeth. This is clearly apparent in FIGURE 2. The plane of the highest surfaces of the bevel gear teeth is there indicated by the broken line designated by numeral 18.

Each ratchet tooth face of the clutch is in the form of an arcuate sloping surface extending from a peak or crown or ridge 19 to a valley or channel 20. The engaging face 21 of each ratchet tooth lies generally along a radial plane extending through the longitudinal center line or axis of rotation of the composite unit. However, as more clearly seen in FIGURE 5, the engaging face 21 is preferably provided with a slight convexity to form a small crown. The outer peripheral edge of each ratchet tooth abuts against and is integral with the inner periphery of the bevel gear. This contributes to the added strength of the composite unit.

Combination gears and clutches of the type described have been known heretofore. However, because of fabrication problems these prior units have always been made as separate parts and then secured together in some convenient manner. For example, the ratchet and bevel gear were separately formed, and then brazed together; or the ratchet was first formed and a bevel gear blank was then brazed to it, and, thereafter, the gear teeth were generated. In such two piece construction the bevel gear and ratchet were brazed generally along the broken line indicated at 22 in FIGURE 2, the bevel gear being supported on shoulder 23 of the ratchet.

The reason why this means of fabrication was necessary is that it was not possible to cut the ratchet teeth by existing tooth cutting means because of the offset recessed or depressed relationship between the ratchet teeth of the clutch and the teeth of the bevel gear. In other words, the area of the work blank in which the ratchet teeth were to be formed was inaccessible by ordinary tooth cutting means utilizing revolving disc or wheel type cutters. By forming the parts separately no such problem existed. The ratchet teeth of the clutch when separated from the bevel gear, were formed in the conventional manner by conventional tooth cutting means.

For many years the two part brazed structures were satisfactory in service. However, with increasing horsepower the composite gears and clutches are subjected to greater forces, with the result that shearing occurred at the site of the braze between the gear and clutch. Previous attempts to strengthen the composite gear and clutch structure have not been successful.

Thereupon, the integral composite gear and clutch according to the present invention was conceived but such structure was impossible of manufacture by existing tooth cutting means because of the inaccessibility of the work piece by the cutting tool in the area of the ratchet teeth. Accordingly, the method as illustrated in FIGURES 3 and 4 was conceived as a means of overcoming the seemingly insurmountable fabrication problem.

According to that method, the work piece is machined to outline shape from steel bar stock of appropriate quality and strength.

The resulting work piece is held in a suitable jig at an angle with respect to a cutting tool **25** corresponding to the desired slope of the face surface of the ratchet teeth. The end cutting face of the tool **25** is brought into contact with the work piece and cuts the ratchet tooth surface by a combination of the relative rotational movement of the cutter about its own axis and rotational movement of the work piece about its own axis through an arc dependent upon the desired number of ratchet teeth.

The channel or valley **20** between adjacent ratchet teeth and the engaging face **21** of each ratchet tooth is formed by another side milling cutter **27** having cutting faces at its edges. Cutter **27** is positioned relative to the work piece so that the axis of rotation of that cutter varies from generally parallel to the axis of rotation of the finished integral gear and clutch to about 8° or so away from the axis of rotation of the finished part. Cutter **27** and the work piece move relative to one another along a path lying generally along a radius of the work piece. However, as shown in FIGURE 4, cutter **27** and the work piece preferably move relative to one another along a very slightly arcuate path to produce the desired crown on the engaging face **21**. Each cutting operation is repeated to complete the required number of ratchet teeth. The edge between ratchet tooth ridge **19** and engaging face **21** is preferably chamfered. Because the bevel gear teeth **15** are out in an exposed accessible portion of the work piece, the bevel gear teeth are produced by conventional tooth cutting means in the conventional manner. The bevel gear teeth may be generated before or after the ratchet teeth, but preferably afterward.

In FIGURE 5 there is shown on an enlarged scale the portion of the plan view of FIGURE 3 included within broken line circle **28** in order to show more precisely the preferred construction of the ratchet tooth engaging faces **21**. In order to concentrate the load of the force exerted upon the clutch teeth by an engaging clutch dog in the center of the teeth it is desirable that the engaging faces of the teeth be provided with a slight convex crown. In order to produce such a crown according to the specifications of the designer of the mechanism in which the gear and clutch is used, cutter **27** is moved relative to the work piece along an arcuate path of large radius. This produces the very slight convex curvature of the engaging face **21** as shown in the enlarged detail view of FIGURE 5. As an example of design specifications in this regard, one requirement is that the surface of the engaging face **21** of the ratchet tooth have a crown of 0.002 inch in a ⁵⁄₁₆ inch length and that the crown be centered in the shaded zone **29**. Obviously the height of the crown can be varied to meet specific requirements. Similarly, the degree of inclination of the engaging faces of the ratchet teeth from the radial plane extending through the longitudinal center line of the integral gear and clutch may be varied to meet design specifications. In the example given, the engaging face **21** is inclined 5° inwardly from the edge with ridge **19**.

Although the invention is described and illustrated by specific reference to a combined bevel gear and clutch, it will be apparent that the principles are applicable to any composite integral toothed structure in which the toothed engaging faces are offset or displaced with respect to one another such that one set of teeth are in a location which is inaccessible by conventional tooth cutting means. The invention is obviously not limited to any particular size or shape or arrangement of gear teeth, or for a working part for the purpose of performing any specific function or a working part for use in any particular mechanism.

It is apparent that many modifications and variations of this invention as hereinbefore set forth may be made without departing from the spirit and scope thereof. The specific embodiments described are given by way of example only and the invention is limited only by the terms of the appended claims.

I claim:

1. A method of making a one piece integral/composite polyfunctional toothed working part adapted for rotation about an axis and having at least two concentric annular rings of teeth disposed about that

axis, one of said rings of teeth being unobstructed by any portion of said working part and another of said rings of teeth being recessed with respect to said first ring of teeth, said method comprising forming a work piece by machining metal stock to outline shape, cutting said recessed teeth by rotating a rotatable cutting tool having an end cutting face in contact with the blank work piece and moving said work piece relative to the end cutting tool in one direction and rotating a rotatable cutting tool having side edge cutting faces in contact with said work piece and moving said work piece relative to the side cutting tool in another directing to delineate said teeth, and cutting said unobstructed teeth by revolving edge cutters of a gear cutter in contact with the blank work piece and moving said work piece relative to the gear cutter to delineate said teeth.

2. A method of making a one piece integral/composite gear and clutch adapted for rotation about an axis, said gear and clutch including an unobstructed annular ring of a plurality of generally radial gear teeth disposed about the axis of rotation and an annular ring of a plurality of arcuate sloping ratchet teeth concentric with and within the inner periphery of said ring of gear teeth, said ratchet teeth being recessed relative to said gear teeth and each of said ratchet teeth having a generally radial engaging face; said method comprising forming a blank work piece by machining metal stock to outline shape, cutting the sloping faces of said recessed ratchet teeth by rotating a rotatable cutting tool having an end cutting face in contact with the blank work piece and moving said work piece relative to the end cutting tool generally about the axis of the work piece to delineate the sloping faces of the ratchet teeth, cutting the generally radial engaging faces of said recessed ratchet teeth by rotating a rotatable cutting tool having side edge cutting faces in contact with the blank work piece and moving the work piece relative to the side cutting tool generally radially to delineate the spaces between adjacent teeth and cutting said unobstructed radial gear teeth by revolving edge cutters of a gear cutter in contact with the blank work piece and moving said work piece generally radially relative to the gear cutter to delineate said radial gear teeth.

### References Cited by the Examiner

#### UNITED STATES PATENTS

| 840,055 | 1/1907 | Ferguson | 74—333 |
| 1,859,171 | 5/1932 | Riley | 74—333 |
| 2,062,927 | 12/1936 | Peterson | 29—159.2 |
| 3,100,333 | 8/1963 | Friend | 29—159.2 |

JOHN F. CAMPBELL, *Primary Examiner.*

DON A. WAITE, *Examiner.*

THOMAS H. EAGER, L. H. GERIN,
　　　　　　　*Assistant Examiners.*